**William HOWARD, Appellant,**

v.

**W. Frank SMYTH, Jr., Director, Virginia Division of Corrections, Appellee.**

**No. 10441.**

United States Court of Appeals
Fourth Circuit.

Argued May 4, 1966.

Decided Aug. 9, 1966.

---

Wilbur C. Allen, Richmond, Va. (Court-assigned counsel) [Allen, Allen, Allen & Allen, Richmond, Va., on brief], for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Circuit Judge, and FIELD, District Judge.

SOBELOFF, Circuit Judge:

William Howard petitioned the District Court to order his release from the maximum security ward of the Virginia State Penitentiary, where he has been confined for four years, and to allow him to rejoin the rest of the prison population. After an evidentiary hearing, the District Court denied the requested relief, and Howard appealed.

Petitioner has been incarcerated in the Virginia prison system since 1956, having been sentenced for armed robbery, and is scheduled for normal discharge without benefit of parole on February 24, 1967. He has been confined in the maximum security ward, known as "C" building, since August 7, 1962.

The prison officials argue that confinement in the maximum security ward is not "punishment" but merely "segregation," and that therefore courts have no power to interfere with their decision to confine an inmate in maximum security. We do not accept this argument. While confinement in "C" building is not as harsh as solitary confinement, the District Court noted that the prisoner's "institutional privileges are severely limited," whether the confinement be described as "punishment" or "segregation." Prisoners in "C" building are not permitted to work and earn money; they are allowed only two meals a day, and are deprived of radio, television, and movie privileges; they do not have access to the library and are not permitted to attend educational classes; they are allowed to bathe only once a week, as opposed to daily bathing allowed other prisoners. It is also highly signifi-

cant that the Parole Board declines to consider as eligible for parole any prisoner who is confined in the maximum security ward. These deprivations cannot be treated as insubstantial.

The circumstances which led to petitioner's confinement are as follows. In July, 1962, Howard, then a professing Black Muslim, met with Prison Chaplain Cecil Gunn in an effort to secure for the Black Muslims among the prison inmates an opportunity to worship according to their religion's tenets. Howard reiterated his request to Chaplain Gunn on August 5, 1962, and on that occasion Gunn called C. C. Peyton, the assistant superintendent of the prison, and arranged for Howard to go to Peyton's office. Howard testified at the hearing in the District Court that in his conversation with Peyton he repeated his request that the prison permit religious services for Muslims. Peyton replied that he would have to discuss the matter with the prison superintendent, W. K. Cunningham, Jr.

Two days later, on August 7, 1962, Howard was called to Superintendent Cunningham's office, where he again voiced his desire for religious services for himself and others of the Muslim faith. Cunningham then demanded the names of the prisoners for whom Howard spoke. This demand Howard refused, explaining at the hearing that he feared that some sort of disciplinary action would be visited upon them. Cunningham then summarily ordered that Howard be confined in the maximum security unit of the penitentiary, where he has remained from August 7, 1962, to the present. Superintendent Cunningham admitted that he gave no hearing to Howard before ordering his confinement in the maximum security ward, although it was the customary practice to hold such a hearing. The only record of the

reasons for this confinement is a notation, "transferred * * * by order of the superintendent for the good of the institution." [1] Nor is there any record or notation indicating the reasons for his continued confinement, despite the fact that the status of prisoners in the maximum security ward is reviewed every six months.[2]

There is no contention that Howard created any disorder or other difficulty in the prison before his request for religious services. There is testimony that in 1965, while in the maximum security ward, Howard became involved in a fight with two other prisoners and was disciplined accordingly. However, this one incident in 1965 was not cited in any record or at the District Court hearing as a reason for Howard's continued confinement in "C" building. The sole reason for ordering confinement in "C" building in August, 1962, and apparently for continuing · this confinement, was Howard's refusal to disclose to the prison authorities the identity of the Muslim prisoners who desired religious services and for whom he professed to speak. As Superintendent Cunningham testified: "I placed their leader where he couldn't get in contact with his group, on the theory that if you cut off the head the body dies, as it turned out to be." This Draconian judgment was justified by the superintendent on the ground that he wished to prevent any trouble in the form of riots or escape.

Although prison officials may and should be alert to exercise their legitimate authority to prevent breaches of discipline, even this acknowledged broad authority may not be exercised to discipline a prisoner who merely expresses for himself and others a desire to worship according to their religious dictates.

---

1. Although Cunningham and Peyton testified at the hearing that they could not remember whether Howard had made a request for religious services, the District Court credited Howard's testimony and found that at the meetings with the prison officials "he expressed his desire to hold Muslim religious services * *." If Howard's version were not accepted there would be no rational explanation of the superintendent's order.

2. Howard was interviewed every six months until June, 1965, when he refused to meet with the prison officials.

If a Protestant or Catholic or Jewish inmate had expressed a desire to worship with others of his faith, there can be little doubt that the prison officials would have been disposed to honor the request; and if for any reason this was thought impracticable, it can hardly be supposed that the mere making of the request or even the refusal to reveal the identity of other prisoners sharing in this concern would have led to punishment by years of confinement in the maximum security ward.

Perhaps the superintendent could justifiably have rejected the request for religious services, when he was refused the names of those interested in participating. That issue is, however, not before us. If the superintendent thought it pertinent to the processing of the request to have the names of the prisoners in whose behalf Howard interceded, he could readily have called upon those desiring to worship according to the Muslim faith to sign a list. If the list, or any other circumstances, convinced him that a dangerous situation might be created if services were allowed, the superintendent could then take appropriate steps to avoid the danger. There appears no just reason for casting the proponent of Muslim religious services, who had been guilty of no misconduct, into the maximum security ward for an indefinite period. The court will not countenance the arbitrary imposition of such serious disciplinary action where the assertedly offensive conduct bears so close a relationship to First Amendment freedoms.

 We are not unaware that courts, including this court, have been reluctant to interfere with the conduct of prisons, with the enforcement of their regulations, or their discipline. See Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963); Roberts v. Pegelow, 313 F.2d 548 (4th Cir.1963). Prison officials need not stand by if religious services are used to undermine their legitimate disciplinary authority. In this case, however, there is no intimation that Howard had such ulterior motives.

We hold only that where a prisoner, acting not surreptitiously but frankly and candidly through proper channels, requests arrangements for religious services but refuses to divulge the names of the other interested prisoners, and as a result is summarily confined in the maximum security ward for a period of years, the only reasonable conclusion is that he is being arbitrarily punished. A prisoner is not bereft of all his rights. Included among those retained is an immunity from punishment for making a reasonable attempt to exercise his religion, even a religion that to some of us may seem strangely confused and irrational.

The judgment of the District Court is reversed and the case is remanded with instructions to order the prison officials to release Howard from the maximum security ward and to allow him to rejoin and remain with the rest of the prison population as long as his conduct conforms to proper prison regulations.

Reversed and remanded.