Robert Jewell **LANDMAN**, Sr., Appellant,

v.

C. C. **PEYTON**, Superintendent of the Virginia State Penitentiary, Appellee.

No. 10687.

United States Court of Appeals Fourth Circuit.

Argued Oct. 7, 1966.

Decided Nov. 28, 1966.

Robert A. Cox, Jr., Richmond, Va. (Court-assigned counsel), (Hirschler & Fleischer, Richmond, Va., on brief), for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

The appellant, an inmate of the Virginia State Penitentiary, seeks review of the District Court's dismissal of his claim that the disciplinary punishment meted out to him by the prison authorities trenched upon his constitutional rights. The holding was made after an evidentiary hearing extending over four days, at which the testimony of the prisoner and other inmates was specifically controverted by prison officials. We affirm the District Court.

Robert Jewell Landman, Sr., petitioned the District Court on March 11, 1965 to order his release from the maxi-

mum security unit of the Virginia State Penitentiary, in which he has been confined from time to time since November 8, 1963, and to restore him to the general prison population. He alleged that his confinements stemmed solely from his having instituted certain legal proceedings and that he was denied unhampered access to the courts in violation of his constitutional rights. In an amended petition, filed on September 7, 1965, he also sought immediate total release from prison on the ground that the treatment he received during his confinement in the maximum security unit, known as "C" building, constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution.[1]

In our recent decision in Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966), we had occasion to describe life in the segregation cells of "C" building. The building, isolated from the rest of the prison complex and surrounded by a concrete wall, is itself divided into two sections, one designated as "segregation," the other "meditation" or, as it is commonly referred to, solitary confinement. The prison superintendent, C. C. Peyton, testified that inmates are placed in segregation for "safekeeping [and the] good of the institution," while confinement in solitary is reserved for violators of institutional regulations. Prisoners confined in segregation

> are not permitted to work and earn money; they are allowed only two meals a day, and are deprived of radio, television, and movie privileges; they do not have access to the library and are not permitted to attend educational classes; they are allowed to bathe only once a week, as opposed to daily bathing allowed other prisoners. Howard v. Smyth, supra at 429.

Additional deprivations, according to Superintendent Peyton, are imposed upon inmates confined in solitary. There are no writing or visiting privileges, except in an emergency; the diet consists of bread and water for two days and two regular "C" building meals on the third day; combs, toothbrushes, razors and most other personal items are withdrawn; bedding consists of a mattress and one or two blankets; the only clothing provided is a pair of pants, a shirt, and a pair of socks.

## I.

Landman is serving a sentence for robbery. When he was first disciplined, in November, 1963, he was placed in meditation for 25 days for allegedly causing a letter to be mailed to the Richmond Newsleader without first submitting it to the censors as required by the regulations. The District Court did not credit his testimony that he had given the letter to one of the guards only to be checked for accuracy, since it discussed their pay scales and retention standards, and had not requested him to mail it. The guard was subsequently discharged because of this dereliction. Upon his return to the general prison population, Landman sent a letter to the Governor of Virginia which ranged over many areas of suggested prison reform. One copy was posted on the prison bulletin board and another circulated among the inmates, who were urged to make their grievances known. Deeming it not in the best interest of the institution to allow Landman to agitate in this manner, prison officials placed him in segregation.

Landman also testified that at 5:15 a. m. on the morning of January 6, 1965 he was transferred to State Convict Road Camp 31 despite his protest that he had an appointment with his attorney, who planned to visit him the next day. The guards who escorted him to the road camp denied that he registered any complaint at the time and Superintendent Peyton testified that prison officials

---

1. State prisoners have a constitutional right to be free from cruel and unusual punishment, Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L. Ed.2d 758 (1962), and to be accorded un- fettered access to the courts to seek vindication of their rights. Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966).

were unaware of the scheduled meeting. Crediting the prison personnel, the District Court found that the transfer was not an attempt to deny Landman access to counsel or to the courts. Again, on May 24, Landman was placed in solitary for violating the regulation reinforced by a direct order to him from Peyton, prohibiting prisoners from accepting compensation for drafting writs on behalf of other inmates. The District Court rejected Landman's version that he had performed these services gratuitously.

On another occasion, Landman was placed in solitary for violation of the regulation forbidding inmates to use for scrap legal paper supplied by the penitentiary. The court rejected his testimony that the "writ" paper had been defaced by another inmate and was lined for scoring games. The prisoner also complained of innumerable searches of his cell, after which he found some of his legal papers missing and the others in a state of disarray. The District Court found that while his cell was searched in the course of routine investigations, his papers were not scattered and the only papers removed were those reflecting violations of prison regulations. Landman told of numerous delays in obtaining notarial services, writ paper and other documents necessary to pursue his legal actions, but the court did not accept this testimony and found that on no occasion

was he intentionally denied access to the courts.

■ The appellant and several other inmates testified in support of the claim that the treatment accorded them in "C" building, both in segregation and in meditation, did not conform to prison regulations and constituted cruel and unusual punishment. Guards allegedly withheld food, struck inmates with clubs, and used tear gas indiscriminately as punishment. On the conflict in the testimony between the prisoners on the one hand and the guards and prison officials on the other, the court believed the latter. While it found that tear gas was used approximately 12 to 15 times in the course of a year, it concluded that this was done in the legitimate exercise of disciplinary authority.[2] The court also found, contrary to appellant's claims, that there was no arbitrary deprivation of rations and that inmates were not subjected to corporal punishment. After reviewing the evidence concerning the quality and amount of food provided for inmates confined in solitary, the court declared the claim of cruel and unusual punishment without foundation.

■ Landman's able court-appointed counsel interviewed 14 or 15 inmates and at the hearing called most of them as witnesses. The District Court saw and heard them and noted no evidence of malnutrition or physical injury.[3] Landman's

2. Superintendent Peyton testified that the guards have blanket authorization to use tear gas against a "recalcitrant" inmate, in addition to employing it in its customary role to prevent riots and escapes. A written report is required only after a tear gas shell is fired. The superintendent also stated that no record is kept of the number of shells issued and no crosscheck is made to determine if reports are filed covering each instance that the gas is employed. By way of contrast, the use of tear gas against a single inmate in a federal prison is permitted only "in most extraordinary circumstances and after approval in writing of the warden or superintendent." U. S. Department of Justice, Bureau of Prisons, Use of Tear Gas and Smoke 3 (1949). While it is our belief that the federal practice is the more enlightened, we will not disturb the find-

ing that the use of tear gas revealed in this record did not amount to "cruel and unusual punishment."

3. While the court did not observe any external symptoms of physical injury, no testimony was adduced regarding possible complications caused by over-exposure to tear gas. Although the gas has a physiological effect for only a short period, prolonged exposure to intense concentrations may be dangerous. Use of Tear Gas and Smoke, supra note 2, at 2. Its use 12 to 15 times a year in the small area comprising "C" building opens the institution to charges of mistreatment difficult to refute. Were the prison to implement the federal practice, see note 2 supra, the use of tear gas would be more effectively controlled and the possibility of misuse substantially reduced.

allegations of denial of access to the courts were fully explored and detailed evidence adduced with respect to each specific claim. In *Howard,* supra, we held that where from the uncontradicted testimony the only reasonable inference is that prison officials have acted arbitrarily and have infringed protected First Amendment rights, relief is due. This record, however, comes to us replete with conflicting testimony, and we are not prepared to say that the findings are clearly erroneous.

## II.

However, we feel obliged to express our concern over revelations in the record, largely admitted by the prison officials themselves, of the prevailing laxity in the supervision of "C" building, with the inherent grave danger of arbitrariness and abuse in the treatment of prisoners confined there. Superintendent Peyton admitted that he does not make periodic inspections of the building and that while he "suppose[d]" that he has made surprise visits, he could not recall a single instance. The jurisdiction of the prison disciplinary committee, the alleged forum for probing disciplinary measures taken against inmates, does not extend to "C" building. No reason was given for thus excluding the cases most apt to be troublesome, in which group judgment is of utmost value in preventing arbitrary action and any form of brutality.

Direct responsibility over "C" building is lodged in Assistant Superintendent Oliver, yet he testified that the guards assigned there are authorized to transfer inmates from segregation to meditation without prior submission of a report stating the basis of the transfer. True, the guard is required on the same day to file such a report with Oliver, who then is to review the incident and approve the transfer if, in his judgment, it was proper. But it clearly appeared that investigation of facts beyond those disclosed in the report is made only if Oliver entertains some doubt concerning the propriety of the transfer. Even more significant is Oliver's admission that his investigations are limited to discussion with the guards involved; never, he stated, does he talk with the prisoners. The practical effect of this procedure is demonstrated by Oliver's further admission that he made no investigation of the charges and had no personal knowledge of the underlying facts pertaining to Landman's several confinements in solitary, but that he *"simply took the word of * * * [his] officers."* (Emphasis added.)

The record thus establishes that the fate of inmates confined in segregation or meditation is left largely to the unsupervised and unreviewed discretion of the guard staff assigned to "C" building.[4] While written regulations governing their conduct have been promulgated, these are insufficient if no attempt is made to insure their observance. This state of affairs was defended in oral argument of counsel for the prison administration as inevitable in the operation of a maximum security ward. "C" building, we were told, can be entered only by first passing through the single gate in the concrete wall surrounding the compound. The gate is kept locked at all times and we were apprised that only one key to it exists and that this is permanently retained in the guard tower overlooking the compound. When ingress is sought by anyone, including the superintendent himself, the key is lowered on

---

4. Compare Jordan v. Fitzharris, 257 F. Supp. 674 (N.D.Cal.1966), where the Judge sharply criticized the practice of permitting lower rank personnel to exercise independent discretion in subjecting inmates to special punitive measures without the authorization of the superintendent or anyone on his staff. While the conditions complained of in that case were more extreme than those in the case at bar, the court's criticism nonetheless indicates the dangers to be feared from total relinquishment of supervision by responsible prison officials, as manifested in the record before us. The court's observation about the "slow-burning fire of resentment on the part of the inmates * * * [which] finally explodes in open revolt," Id. at 680, is as germane here as it was in the context in which it was made.

a string, the door unlocked, then again locked after the entrant has passed through. Thereupon, the string is pulled up and the key returned to the tower. Neither the superintendent nor any other official retains an extra key to enable him to visit "C" building for an unannounced inspection. These arrangements, it was said, are necessary to minimize the possibility of riots and escapes. It was recognized, however, that they render impossible surprise inspections. The officer in charge of the tower, who admits those seeking entrance to the compound, can, it is asserted, immediately notify the guards inside of the approach of any visitor via the direct phone line linking the tower with "C" building.

We are unpersuaded by these attempted justifications for giving free rein to the guards assigned to the maximum security ward. We cannot believe that it is beyond the ingenuity of the prison management to formulate procedures that will enable them effectively to oversee and control the guards' conduct. Prisoners placed in "C" building to undergo special punishment are in no less need of protection against abuse than the general prison population. Acton's

classic proverb about the corrupting influence of absolute power is true of prison guards no less than of other men. In fact, prison guards may be more vulnerable to the corrupting influence of unchecked authority than most people. It is well known that prisons are operated on minimum budgets and that poor salaries and working conditions make it difficult to attract high calibre personnel. Moreover, the "training" of the officers in methods of dealing with obstreperous prisoners is but a euphemism in most states.[5]

 Prison administrators in general recognize their obligations to control and restrict the authority of subordinate personnel.[6] There should be conferences or hearings at which prisoners can air their grievances over disciplinary measures taken against them.[7] In addition, provision should be made for periodic inspections by the superintendent or a responsible official on his staff, the dates of which are known to prisoners and guards alike.[8] The effect would be not only to uncover any evidence of beatings or malnutrition but also to provide a channel of communication between the inmates and higher prison officials by

---

5. See Bennett, Evaluating a Prison, Annals, May, 1954, p. 10; Martin, Break Down the Walls 221–225 (1954).

6. See generally Manual of Correctional Standards 231–257 (1964), published under the auspices of the American Correctional Association and reflecting the intensive study of over 120 practicing penologists and prison authorities.

7. "A hearing should take place as soon as practicable after the offense is reported * * *. If the offense needs immediate investigation, it should be initiated at once and the hearing on the offense may be postponed as long as necessary to complete the investigation. * * *

\* \* \* \* \* \* \*

"At the hearing the inmate reported should be given a full opportunity to state his case and, if the offense is a serious one and he claims that witnesses could establish his innocence or bring out important mitigating factors, such claims should be carefully investigated. * * *

"Offenders shall be provided and advised of a regular channel of appeal from the finding made or the penalty assessed at any disciplinary hearing. For example, where a subordinate officer handles routine matters, disposition may be appealed to the Disciplinary Committee. Provision should be made for the inmate to send sealed uncensored letters to the Governor, the Director or Commissioner, or his deputy, and members of the paroling authority." Id. at 241–42.

8. "The associate warden (assistant superintendent) or whoever is in charge of discipline should visit inmates in punitive segregation daily, and even more often if possible. He may make recommendations to the Disciplinary Committee for release of inmates from punitive segregation whenever he feels the desired results have been accomplished. * * *

" * * * Whenever a senior official visits the isolation or the segregation group, he should make a notation on each card or log-sheet of the date and time of his visit and should initial it." Id. at 253.

which complaints could be brought to the immediate attention of the superintendent. These protections would make surprise inspections largely superfluous and we cannot condone the demonstrated lack of supervision on the asserted ground that such inspections are unfeasible. Under our constitutional system, the payment which society exacts for transgression of the law does not include relegating the transgressor to arbitrary and capricious action.

Courts are not called upon and have no desire to lay down detailed codes for the conduct of penal institutions, state or federal. And it is not our purpose to do so. But, we cannot, without defaulting in our obligation, fail to emphasize the imperative duty resting upon higher officials to insure that lower echelon custodial personnel are not permitted to arrogate to themselves the functions of their superiors. Where the lack of effective supervisory procedures exposes men to the capricious imposition of added punishment, due process and Eighth Amendment questions inevitably arise.

Experience teaches that nothing so provokes trouble for the management of a penal institution as a hopeless feeling among inmates that they are without opportunity to voice grievances or to obtain redress for abusive or oppressive treatment. It is common knowledge that many prison riots have been in protest of abuses in disciplinary cell blocks similar to "C" building.[9] We strongly commend to the close scrutiny of higher officials of the state the general problem of effective supervision of prison personnel, especially of those in direct charge of the segregation and meditation units. Justice to the legal rights of the prisoners affected and orderly administration of the prison system demand corrective measures.

Affirmed.

9. See Bennett, Why Fear and Hate Shadow Our Prisons, N. Y. Times, May 11, 1952, § 6 (Magazine), in Of Prisons and Justice—A Selection of the Writings of James V. Bennett, S.Doc.No. 70, 88th

Cong., 2d Sess. 159 (1964); MacCormick, Behind the Prison Riots, Annals, May, 1954, p. 17; Martin, Break Down the Walls passim (1954).