393 F.2d 775
 Charles M. ABERNATHY, Appellant,
v.
W. K. CUNNINGHAM, Jr., Director, Division of Corrections; C. C. Peyton, Superintendent of the Virginia State Penitentiary; and M. L. Royster, Superintendent of the Virginia State Farm, Appellees.
 No. 11608.
 United States Court of Appeals Fourth Circuit.
 Argued November 6, 1967.
 Decided April 1, 1968.
 
 Robert L. Taylor, Richmond, Va., (Court-appointed counsel) [Edward E. Lane & Associates, Richmond, Va., on brief] for appellant.
 Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellees.
 Before BOREMAN and CRAVEN, Circuit Judges, and WOODROW W. JONES, District Judge.
 BOREMAN, Circuit Judge:
 
 
 1
 Abernathy, a Virginia prisoner, petitioned the district court to order his release from the maximum security building at the Virginia State Penitentiary at Richmond and, further, to grant him certain relief in matters incident to the free exercise of his religion, Islam. After several conferences, the court scheduled a hearing for February 1967. The hearing was recessed, however, to permit the respondents to file an amended answer advising the court of the penitentiary's recently inaugurated regulations concerning Muslim prisoners.[1] Although many of this prisoner's complaints were satisfactorily resolved by the new rules, several were not, and Abernathy himself still remained in the prison's maximum security section, "C" Building. Thereafter, in April 1967, the district court conducted an exhaustive evidentiary hearing at the conclusion of which the court denied relief on all but one of the issues still before it. After a thorough review of the record we affirm.
 
 
 2
 Initially, we consider Abernathy's contention that he is being illegally detained in "C" Building but no extended discussion concerning precisely what is involved in "C" Building detention is necessary here as this court has on two recent occasions discussed this feature of the Virginia penal system. See Landman v. Peyton, 370 F.2d 135 (4 Cir. 1966), cert. denied, 385 U.S. 881, 87 S.Ct. 168, 17 L. Ed.2d 108 (1966); Howard v. Smyth, 365 F.2d 428 (4 Cir. 1966), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966). "C" Building houses some prisoners assigned to solitary confinement. However, the greater number of its inmates are not so confined; they, like Abernathy, are in maximum security detention which is more restrictive than imprisonment of the prison population at large but not nearly so harsh and confining as that of prisoners in "solitary." While this court, faced with the facts in Howard and Landman, spoke quite harshly of the uses made of "C" Building, we certainly did not intend to imply that a prisoner's confinement there may not be justified and represent a valid exercise of the judgment and discretion of prison officials in the difficult area of penitentiary discipline. Such a situation is presented here.
 
 
 3
 Abernathy was convicted of murder and robbery in 1960. In late summer of that year he entered the penitentiary at Richmond where he remained for only a few months prior to his removal to the Virginia State Farm in January 1961. Frequently, from that time until January 1965 when he was returned to Richmond and placed in "C" Building's maximum security section, Abernathy was a source of trouble. The prison farm records reveal that, during his four-year stay there, Abernathy was punished a total of fifteen times for various offenses.[2] We conclude that the decision to return him to Richmond and to "C" Building was fully justified. He had demonstrated again and again that he was unruly, continuously in trouble, unable to mix with the general farm population and unable "to get back on the right track."
 
 
 4
 Abernathy, still confined in "C" Building, contends (1) that he should be released therefrom as his confinement there amounts to punishment and is unreasonable in light of the offenses he has admittedly committed and for which he has already been punished; also (2) that his confinement is the result of officials' discrimination against him because of his race (Negro) and religion.
 
 
 5
 The first of these contentions has really been answered above. While confinement in the maximum security area ("C" Building) is admittedly a form of punishment for past misconduct it also assures that those prisoners who have shown themselves to be unable to mix with the general prison population without undue friction, or whose presence poses a threat to general prison discipline and safety, are set apart and kept under much closer observation than would otherwise be possible. Their opportunities for getting into trouble are greatly lessened although some — like Abernathy — still manage to commit punishable offenses.[3] At the same time, the inconveniences which necessarily attend maximum security detention provide an incentive for cooperation by the prisoner. The decision to place Abernathy in maximum security was made by the Director of the Division of Corrections on the advice of his assistant. We agree with the determination of the court below that the action taken was not arbitrary or capricious, and that the decision to keep him there has been fully justified.[4]
 
 
 6
 Prison officials testified below that the fact that Abernathy is a Negro and professes belief in the Black Muslim faith was unrelated to his removal to "C" Building. In fact, it is undisputed that prisoners of both races comprised the group of four men who were moved to "C" Building with Abernathy and that the Corrections Director, who made the ultimate decision to transfer him, was totally unaware of his religion. Abernathy introduced no evidence which in any way substantiated his charge of racial or religious discrimination, and we find no reason to disagree with the district court's determination that this contention is unsupported by the evidence and thus without merit.
 
 
 7
 We turn now to Abernathy's claims that he is hindered by prison regulations in the free observance and pursuit of the teachings of his religion. Specifically, Abernathy seeks to have a pork-free meal served him at noon, the right to subscribe to and receive Muhammad Speaks, a Muslim newspaper, and the right to receive Message to the Blackman in America, a book by the Muslim leader, Elijah Muhammad.
 
 
 8
 Meals at the penitentiary are served cafeteria-style, and a prisoner may exercise unfettered choice in the selection of his meal from among the items served. The penitentiary has no regulation concerning what he must take or eat, insisting only that he eat all which he chooses to take from the serving counters. At the hearing below Abernathy testified briefly that the Muslim faith prohibits the eating of pork in any form and that the penitentiary consistently serves pork, or food cooked in grease or lard. According to him, such tainted food is served so frequently that he would suffer from malnutrition should he attempt to abstain from pork through a process of individual selection. Prison authorities, however, testified to the contrary, maintaining that adequate nourishment could be obtained from a prison meal consisting solely of foods cooked without pork chosen from among the variety offered. They admit such a meal would perhaps not contain everything one might desire, but they insisted that it would provide a balanced ration. The district court so found, choosing to credit the testimony of the officials. Under these circumstances, the court determined that the prison was not required to provide a special diet and we agree.
 
 
 9
 Abernathy's remaining contentions relate to his desire to be permitted to obtain a copy of Elijah Muhammad's book, "Message to the Blackman in America," and to subscribe to Muhammad Speaks, a newspaper published in Illinois, if not under Muhammad's direct supervision, at least under his auspices. The book contains an exposition of the doctrines and history of Islam with a lengthy discussion of Muhammad's views of separatism and the future of the races. Muhammad Speaks, while containing a great deal of nonreligious news matter, is, according to Abernathy, his only source material in the study of the teachings of his faith. Admittedly, if Abernathy were not in prison he clearly would have the right to receive these publications without restraint of any kind. The question here posed is whether the fact of imprisonment permits the State to exercise a restraint on this admitted right. We hold that it does.
 
 
 10
 As the Supreme Court stated in Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Certainly the maintenance of prison discipline is a consideration ever present in the minds of prison officials, a consideration which in itself makes necessary the withdrawal or curtailment of numerous rights and privileges a prisoner would otherwise enjoy. It is this concern which led the prison authorities to ban these publications from the Virginia penitentiary. The district court found this to be a valid and justified consideration. On review of the entire record and upon close examination of the book and issues of the newspaper, we agree.
 
 
 11
 The Black Muslim teachings of Negro superiority and supremacy and of hatred for the white race are everywhere evident in the Message to the Blackman. Indeed, these themes constantly and explicitly recur throughout the book. They are also present in Muhammad Speaks, although there they tend to manifest themselves not so much in the precise wording of the text but more in the entire tenor of the paper, the subject matter of the articles, the "slant" of the writings, the headlines, the photographs, and in the drawings and cartoons found throughout each issue. The Virginia penitentiary is totally racially integrated with members of all races living and working constantly in close contact. It is the considered opinion of the prison authorities that such material as Message to the Blackman and Muhammad Speaks would, in this setting, be inflammatory and subversive of discipline. This determination is not, so far as the record discloses, motivated by religious prejudice or intended as a discriminatory deprivation. If it were, clearly it could not, under the Constitution, withstand Abernathy's challenge. See Rivers v. Royster, 360 F.2d 592 (4 Cir. 1966).
 
 
 12
 Moreover, the officials' evaluation of the literature and of its probable effect on relations among the prisoners is not to be lightly regarded. The court should not substitute its judgment, based purely on the publications themselves, for that of the officials, based as it was not only on the publications but also on the intimate knowledge of the prisoners and on the officials' familiarity with the conditions prevalent in this particular penal institution and without evidence of motivation which would render the ban a violation of Abernathy's constitutional rights. The decision was based on considered professional opinion which warrants the resulting rule denying access to the publications in question. We reach this conclusion notwithstanding our information to the effect that Muhammad Speaks is not uniformly banned by prison authorities throughout the United States.[5]
 
 
 13
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 In their amended answer respondents advised the court of the institution of the following policies: (1) the local Muslim minister would be permitted to hold weekly services at a time and place to be designated by the superintendent; (2) Muslim prisoners would be permitted to write to and communicate with their local ministers. The rules governing these practices were to conform to those governing similar practices by members of other faiths. However, as in the case of members of other denominations, these privileges would be extended only to prisoners in the general prison population and not to those in "C" Building; (3) Muslims would be permitted to have copies of the Holy Qua-ran; (4) Muslims would be permitted to wear the symbols of their religion. Also, at the conclusion of the hearing, the district court ruled that Muslim prisoners must be permitted to communicate with Elijah Muhammad, the national leader of their sect, as such correspondence was not shown to present "any grave administrative or security problems" for the prison authorities. None of these points is before the court on this appeal
 
 
 [2]
 This figure may actually be conservative as testimony revealed that a record is not invariably maintained concerning lesser offenses committed at the farm
 
 
 [3]
 The lower court's hearing was held in April 1967. Abernathy's latest recorded offense was committed on January 28, 1967. At that time he had been back in the maximum security portion of "C" Building for only one day following eighteen days in solitary confinement for a previous offense
 
 
 [4]
 Prison policy dictates that every prisoner in "C" Building be granted an interview with prison officials twice a year to determine his suitability for return to the general prison population. Abernathy was interviewed by the penitentiary superintendent when he was returned to Richmond and, as of April 1967, had been interviewed on four subsequent occasions
 
 
 [5]
 Compare Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964), and Coleman v. District of Columbia Commissioners, 234 F. Supp. 408 (E.D.Va.1964), (District of Columbia prisoners allowed to subscribe), with Long v. Katzenbach, 258 F.Supp. 89 (M.D.Pa.1966), and Desmond v. Blackwell, 235 F.Supp. 246 (M.D.Pa.1964), (upholding denial of newspaper to federal prisoners at Lewisburg Prison)
 
 
 
 14
 CRAVEN, Circuit Judge (concurring and dissenting in part):
 
 
 15
 Whether detention in "C" Building at the Virginia State Penitentiary is labeled "punishment" or "maximum security segregation" affords no problem solving leverage. I would agree with Abernathy that as to him detention in "C" Building is "punishment," see Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966), but I also agree with the court that his confinement there is not unconstitutional. Obviously Abernathy is hard to handle, and the district judge's determination that his confinement in "C" Building is not the result of discrimination based on race or religion is strongly supported by substantial evidence.
 
 
 16
 I am more disturbed by the district judge's finding that an inmate of a Southern prison, by exercising discrimination, can select a non-pork, i. e., free of lard, diet and still have a balanced ration. I would have thought otherwise. But the finding is specific that prisoners have an opportunity to abstain from "food cooked with any form of pork or lard." I would feel better about this determination of "constitutional fact" if the cooks had testified, but I concede the finding is supported by substantial evidence and I defer to the judgment of my brothers.
 
 
 17
 I dissent from the court's holding that Abernathy is not entitled to obtain a copy of Elijah Mohammad's book, "Message to the Blackman in America," and is not entitled to subscribe to "Mohammad Speaks," a newspaper published in Illinois. The content of the book and the newspaper is fairly described in the court's opinion. It is held that the literature may lawfully be denied Abernathy because it is subversive of discipline. Whose discipline? Apparently the district judge was concerned not so much with the impact of the newspaper upon Abernathy (his behavior could hardly be worse) as with the possibility of disturbance the paper might cause among other members of the prison population.[1] It is not at all clear to me why it is impracticable to permit Abernathy to subscribe to the paper on condition that he keep it in his own cell.[2] If it is to be assumed that circulation among the general prison population constitutes a clear and present danger to internal discipline, it does not follow that the only remedy is exclusion.
 
 
 18
 I would remand to make further inquiry into the possibility that the literature might be allowed Abernathy on the condition that it not be circulated among other prisoners and subject to the sanction of stopping the privilege upon violation of the condition.
 
 
 
 Notes:
 
 
 [1]
 The district judge mentioned a prior district court decision in which it had been noted that "no workable method of controlling the circulation of the paper once it gets into the prison has been found." (He was referring to the Federal Penitentiary at Petersburg, Virginia, and not to the Virginia State Penitentiary.)
 
 
 [2]
 Publications that are thought to present a threat to prison discipline are sometimes permitted to be received on condition that they are not taken from the prisoners' cells. See Sostre v. McGinnis, 334 F.2d 906, 910 (2d Cir. 1964)