Robert E. BURNS

v.

Harold R. SWENSON, Warden.

Rollie LASTER

v.

Harold R. SWENSON, Warden.

Ronald WESTBERG

v.

Harold R. SWENSON, Warden.

Dempsey OWENS, Jr.,

v.

Harold R. SWENSON, Warden.

Sylvester FAULKNER

v.

W. P. STEINHAUSER et al.

William POLITTE

v.

Harold R. SWENSON, Warden.

Nos. 1072–1113, 1080, 1089, 1102, 1106, 1111.

United States District Court
W. D. Missouri,
Central Division.

July 16, 1968.

Alex Bartlett, Jefferson City, Mo., for plaintiffs.

Norman A. Anderson, Atty. Gen., Howard L. McFadden, Asst. Atty. Gen., State of Mo., Jefferson City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

Plaintiffs in these consolidated cases are all inmates at the Missouri State Penitentiary at Jefferson City. At the time the complaints were filed, all plaintiffs were housed in the Maximum Security Unit, a separate security section or unit within the Missouri State Penitentiary. Both equitable relief and damages were sought pursuant to Sections 1981 et seq., Title 42, United States Code. These cases now pend on defendants' motion for summary judgment. Appropriate relief will be granted for reasons we now state.

Plaintiffs alleged that the administrative procedures under which each had been placed in the Maximum Security Unit and that certain administrative practices to which they were subjected after being placed there constituted action taken under color of state law which allegedly violated certain federal constitutional rights retained by them as inmates. Those actions included alleged violations of their freedom of religion,[1] interference with their rights of freedom of speech and expression through correspondence,[2] violations of access to the courts,[3] violation of their right to be free from cruel and unusual punishment,[4] and denial of adequate medical care and treatment.[5]

---

1. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Howard v. Smyth, (4th Cir. 1966) 365 F.2d 428; Brown v. McGinnis, 1962, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791.

2. Note, "The Right of Expression in Prison," 40 So.Calif.L.Rev. 407 (1967).

3. Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Smartt v. Avery, (6th Cir. 1967) 370 F.2d 788; Edwards v. Duncan, (4th Cir. 1966) 355 F.2d 993; Jenks v. Henys, (9th Cir. 1967) 378 F.2d 334; and United States ex rel. Diamond v. Social Service Department, D.C.Pa.1967, 263 F.Supp. 971. See in particular Coonts v. Wainwright, M.D.Fla.1968, 282 F.Supp. 893, which follows the district court rather than the court of appeals in Johnson v. Avery, M.D.Tenn., 252 F.Supp. 783, rev'd. 382 F.2d 353 (6 Cir. 1967).

4. In re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890); Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Talley v. Stephens, E.D.Ark.1965, 247 F.Supp. 683; Jackson v. Bishop, E.D.Ark.1967, 268 F.Supp. 804; Jordan v. Fitzharris, N.D.Calif.1966, 257 F.Supp. 674.

5. Hirons v. Director, Patuxent Institution, (4th Cir. 1965) 351 F.2d 613; Edwards v. Duncan, supra; Coleman v. Johnston, (7th Cir. 1957) 247 F.2d 273; Basista v. Weir, (3rd Cir. 1965) 340 F.2d 74. Cf. Tribby v. Cameron, 1967, 126 U.S. App.D.C. 327, 379 F.2d 104.
The only factual situation establishing a denial of adequate medical care was in regard to plaintiff Laster. The affidavit of Harold R. Swenson referred to above states:
Mr. Laster who was released from maximum security on 9–27–67 has had considerable medical attention since that date. He had an operation on his left arm, performed by Dr. Lynn O. Litton, at the University Medical Center in Columbia on October 24, 1967. * * * Subsequently, Mr. Laster was taken to Columbia for outpatient treatment on the following dates: 11–7–67; 11–21–67; 12–5–67; 12–19–67; and 1–2–68.
Two more similar appointments have been made for January 30, 1968 and April 2, 1968. Reports on the operation have been very favorable and the medical prognosis is good. He was released from the hospital to the general population about three weeks ago.
We therefore consider the contention

The Court requested Alex Bartlett, Esq., of Jefferson City, Missouri, a member of the Bar of this Court, to serve as counsel for the plaintiffs. Mr. Bartlett's service to his clients and to this Court, without remuneration and at great personal sacrifice, is not only in the highest tradition of the Bar, it stands as a prime example of professional responsibility.

It was decided at pretrial conference that the most convenient way to proceed would be to sever the equitable issues in all the cases for trial to the Court before trying the separate damage claims alleged in some of the cases before juries. Accordingly, and pursuant to Rule 42, Federal Rules of Civil Procedure, the equitable issues in each case were first severed and then all equitable issues were consolidated for trial before the Court. During the weeks of April 10, 1967 and May 22, 1967, the Court heard evidence from both sides concerning those consolidated equitable issues.

Following those hearings, additional conferences were held with counsel for both sides. Those conferences included reports to the Court by counsel of their work with officials of the Department of Corrections for the State of Missouri. The Honorable Howard McFadden, Assistant Attorney General of Missouri, Director Fred T. Wilkinson, and Warden Harold R. Swenson are to be highly commended for their exemplary cooperation with Mr. Bartlett and with this Court throughout this pending litigation. During the course of this litigation, the Department of Corrections promulgated and put in effect a completely revised set of rules and regulations regulating inmate conduct at the Missouri State Penitentiary.

Many portions of the new revised rules and regulations relate specifically to areas of contention in this litigation. It is on the basis of changes in the conditions and locale of plaintiffs' present confinement and changes in the rules and regulations governing the Missouri Penitentiary that affect plaintiffs' status within the penitentiary that defendants have moved for summary judgment.

The affidavit of Warden Swenson, filed subsequent to the evidentiary hearings, establishes that all plaintiffs have now been reclassified in accordance with the new rules and released from the Maximum Security Unit. Medical attention has in fact been given plaintiff Laster. It is apparent that the allegations concerning the original placement of these plaintiffs in the Maximum Security Unit are now moot insofar as they may raise presently justiciable equitable issues. The evidence also shows that two additional factors are important regarding the issue of plaintiffs' original placement in the Maximum Security Unit. Both factors are relevant in regard to further proceedings in these cases.

First, the evidence conclusively established that plaintiffs were placed in maximum security during the period before the defendants named in these cases were responsible for the administration of the Missouri Department of Corrections. If the particular circumstances under which plaintiffs were placed in maximum security could be considered actionable, a question we find is unnecessary to determine, the particular defendants before us in these cases could not be held responsible for those placements.

Second, the Department of Corrections is presently operating under the new revised set of regulations governing the classification and assignment of inmates to the Maximum Security Unit. Those revised rules and regulations are, in our judgment, fair and well above any presently legally defined threshhold of administrative due process.[6]

The establishment of a Maximum Security Unit and regulations governing the classification and assignment of particular inmates to that unit are

---

of plaintiff Laster as moot. United States ex rel. Knight v. Ragen, (7th Cir. 1964) 337 F.2d 425.

6. Roberts v. Pegelow, (4th Cir. 1963) 313 F.2d 548.

both matters ordinarily within the discretion of a penitentiary administration. Administrative rules and regulations that are a necessary concomitant of the type of security necessary to be maintained in a Maximum Security Unit are ordinarily matters within the discretion of the administration.[7] Questions of whether past practices may have exceeded the discretion legally vested in the correctional authorities who formerly were responsible for the Missouri Department of Corrections are not before this Court under the present posture of these cases.

■■ Those presently responsible for the administration of the Missouri Department of Corrections have, with commendable foresight, revised regulations that relate specifically to permitted religious practice, to correspondence of inmates, to prisoner access to the courts, and to medical treatment of inmates in the Maximum Security Unit. We specifically find those particular regulations to be fair and that, if fairly administered, are calculated to reasonably protect the broadest construction that could be placed on the federally protected constitutional rights of inmates. Restrictions placed on the rights of inmates properly assigned to the Maximum Security Unit must, in our opinion, be viewed in light of the custody requirements of that unit and must therefore be more stringent than restrictions applicable to inmates in the general population of the prison.

Plaintiffs' contentions relating to cruel and unusual punishment fall into two categories: first, alleged acts of corporally and psychologically abusive treatment of inmates in the Maximum Security Unit, and, second, physical living conditions allegedly so heinous as to violate the minimum federal constitutional standard.

The testimony we heard in these cases regarding abusive treatment of inmates all took place before the present defendants were responsible for the administration of the penitentiary. In addition, these abusive acts were the acts of individual guards, and the testimony plaintiffs presented did not establish a continuing or approved pattern of conduct or policy directed by the named defendants upon which a court of equity could act.[8]

The Court personally viewed the physical facilities of the Maximum Security Unit and, although we found the living areas to be in need of improvement, we do not believe the conditions to be such as to constitute cruel and unusual punishment,[9] within the meaning of the Constitution of the United States. We are convinced that those presently in charge of the Missouri Department of Corrections do the best they can with the money made available to maintain and operate an antiquated physical facility. Indeed, the Honorable James V. Bennett, retired Director of the United States Bureau of Prisons and internationally famous criminologist, testified that he had recommended to a Missouri General Assembly long years ago that the Jefferson City Penitentiary, a part of which has been in continuous use since the Nineteenth century, should be torn down and a new facility constructed so that modern methods of penology could be followed in this State. See also the fourth report of the Joint Committee on Correctional and Institutional Problems of the Missouri General Assembly made in 1965.

Counsel for the plaintiffs has indicated that this Court should state in broad terms the rights retained by incarcerated convicted persons. Counsel states that the plaintiffs believe such a statement necessary to prevent possible future abusive treatment of them and other inmates. Plaintiffs urge that such a statement would avoid possible future breaches of federally protected constitutional rights.

7. Roberts v. Pegelow, supra.

8. Compare Konigsberg v. Ciccone, W.D. Mo.1968, 285 F.Supp. 585 (decided May 3, 1968).

9. Compare Harris v. Settle, (8th Cir. 1963) 322 F.2d 908.

We do not believe it appropriate for this Court to attempt to redelineate a Bill of Rights for prisoners incarcerated in the Missouri Penitentiary. The Manual of Correctional Standards, setting forth policy standards for the governing of correctional institutions adequately emphasizes the importance of orderly and fair process in a penal institution:

1. Rules or conditions governing the conduct of offenders and the consequences which may follow from violation shall be printed and furnished them together with any explanations that may be necessary for their guidance.

2. Such rules or conditions shall be corrective, not abusive, or punitive, in purpose. They shall be no more numerous or restrictive than is necessary to produce responsible and orderly conduct.

3. No penalty shall be inflicted upon any offender for the violation of a rule or condition except in accordance with established disciplinary procedures adopted by the responsible administrative department.

4. Penalties shall not be cruel, inhumane, or degrading, and no corporal punishments shall be employed as correctional measures. No instrument of restraint shall be applied as a punishment. Penalties shall be assessed and applied only in accordance with an ordered system of regulations and sanctions promulgated by the administrative department and made known to the offender.

5. Standardized methods of seeking information concerning offender rights and obligations and of making complaints to the correctional administration shall be established. The offender shall be informed of such methods and permitted to make use of them without intimidation or censorship. Unless it is patently frivolous, every request or complaint shall be dealt with and replied to without undue delay.

6. There shall be no discrimination in the administration of correctional procedures on grounds of race, color, sex, language, religion, political, or other opinion, national or social origin, property, birth, or other status.

7. All accommodation provided for the use of prisoners, including sanitary facilities, clothing, diet, and care shall meet proper requirements for health, safety and rehabilitation. To this end a medical officer shall examine every prisoner as soon as possible after admission and thereafter as necessary. He shall make appropriate recommendations for segregation and classification of those who are found to suffer from disease, defect, or other conditions requiring specialized treatment.

8. The correctional authorities, in fulfillment of their responsibility to keep offenders free from harm, shall exercise all reasonable care to protect their life and health, and are liable for negligent failure so to do.

9. Prisoners shall be allowed to communicate with their family, reputable friends, and legal counsel at appropriate intervals, both by correspondence and by receiving visits and such rights shall not be restricted by reasons of discipline except in instances where they have been abused.

10. No impediments shall be imposed upon the rights of any prisoner to free access to books of law and to the preparation and prompt forwarding of writs, appeals, or complaints to courts of law or to governmental authorities. (pp. 267–268).

We cite this portion of the Manual to illustrate the fact that correctional authorities throughout the United States have begun to see the necessity of setting out fair procedures for the handling of inmate conduct within penal institutions. Indeed, the actions taken by defendants during the course of this litigation, as the correctional authority primarily responsible for Missouri corrections, is consistent with national rec-

ognition that the correctional authorities should take voluntary action before a court is forced to intervene in what should be left to the administrative authorities.

The President's Commission on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, states on page 181:

The law has yet to define limits and standards in this area. But correctional authorities should take immediate steps to insure that there are adequate safeguards by providing for hearing procedures, review of decisions by persons removed from the immediate situation, explicit policy guidelines and standards, and adequate records to support decisions.

The Task Force Report on Corrections of the same Commission states even more explicitly that:

Correctional administrators have been slow to develop policies and procedures to guide correctional officials and protect the rights of offenders. And trial and appellate courts have been reluctant to review either the merits of such decisions or the procedures by which they are made.

Yet it is inconsistent with our whole system of government to grant such uncontrolled power to any officials, particularly over the lives of persons. * * * There are increasing signs that the courts are ready to abandon their traditional hands-off attitude. * * * Recent cases suggest that the whole correctional area will be increasingly subject to judicial supervision. The real question is what form this supervision will take. (pp. 82–83).

The Task Force Report noted that some correctional authorities have continued, in spite of the recent developments noted, "strong resistance to the introduction of increased legal controls in the correctional area." Such resistance seems to be predicated, at least in part, upon the notion that "if prisoners are conceded certain legal rights they will devote their energies to fighting legal battles, rather than accepting the correctional regimen and devoting themselves to more productive activities."

The Missouri correctional authorities, by their actions during the course of this litigation, have established that they do not belong in the resistance group. They belong in the group that recognizes, in the language of the Task Force Report, that "it is inconsistent with the goals [of reformation and rehabilitation] to treat offenders as if they have no rights, and are subject to the absolute authority of correctional officials."

The substantial progress that has been made in Missouri has resulted from recognition of the following principle stated in the Task Force Report:

It is important that correctional administrators, who are most knowledgeable about the problems involved, develop policies and procedures which will accommodate the needs of the system as well as the interests of convicted offenders. The more adequate such internal controls are, the less it will be necessary for courts to intervene to define necessary procedures or to review the merits of correctional decisions. (p. 83).

■ Immunity from judicial intervention, however, requires more than the mere promulgation of fair rules and regulations. Effective effort must be made to disseminate information about those rules through the inmate population and among the personnel. Correctional authorities must, more importantly, take effective steps to see that the new procedures established by the new rules are followed, especially in areas involving potential deprivations of a federally protected constitutional right.[10]

We do not feel that a general exposition of an inmate's federally protected constitutional rights is either necessary or very practical. There, of course, can no longer be doubt that this is a rapidly

10. See Judge Sobeloff's opinion in Landman v. Peyton, (4th Cir. 1966) 370 F.2d 135.

developing field of the law.[11] Wright v. McMann (2nd Cir. 1968) 387 F.2d 519, we think, correctly states that "until recently the federal courts refused to review charges instituted under the Civil Rights Act and arising out of state prison disciplinary procedures." But that case stated that:

> Recent decisions, however, have demonstrated a sharp alteration in the judicial attitude toward these rationales and today the older cases retain little vitality. Indeed, there is no longer any question that a state prisoner may bring an action under the Civil Rights Act. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). Any lingering uncertainty over the applicability of the Eighth Amendment to the States was laid to rest by Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). And, while federal courts are sensitive to the problems created by judicial interference in the internal discipline of state prisons, in appropriate cases they will not hesitate to intervene. Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961); Howard v. Smyth, 365 F.2d 428 (4th Cir.), cert. denied 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal. 1966); Fulwood v. Clemmer, 206 F. Supp. 370 (D.D.C.1962); Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark. 1965). (Ibid. at 522).

And Edwards v. Duncan (4th Cir. 1966) 355 F.2d 993, we believe correctly, evidences the present trend in what has been called the "hands-off" doctrine:

> The hands-off doctrine operates reasonably to the extent that it prevents judicial review of deprivations which are necessary or reasonable concomitants of imprisonment. Deprivations of reasonable medical care and of reasonable access to the courts are not among such concomitants, however. Prisoners are entitled to medical care and to access to the courts. (p. 994).

Powell v. State of Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (decided June 17, 1968) has indicated, however, the necessity for caution in rapidly developing areas of the law and its relationship to the expanding experiences in the social sciences.

Plaintiffs in these cases have obtained most of the relief they sought as a result of far-sighted, voluntary action taken by the present administrators of the Missouri Department of Corrections. Questions of whether defendants are now in fact following the new rules and regulations as they relate to a particular plaintiff must, in our opinion, be treated with very specific and individual judicial scrutiny.

■ Plaintiffs in these cases will therefore be required to present any future grievance or complaint that some federally protected constitutional right has been allegedly violated through the Grievance Procedures established by the new rules and regulations of the Department of Corrections before such complaints are presented to this Court. See and compare our Memorandum and Order filed this day in Cupp v. Swenson, Warden, and companion cases, W.D.Mo. 1968, 288 F.Supp. 1, decided this same day.

On the basis of the record of the hearings in these cases, as well as the materials supplied the Court at the various

---

11. See Note, "Constitutional Rights of Prisoners: The Developing Law," 110 Pa.L.Rev. 985 (1962); comment, "Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts." 72 Yale L.J. 507 (1963); Barkin, "The Emergence of Correctional Law and the Awareness of the Rights of the Convicted," 45 Neb. L.Rev. 169 (1966); Kimball and Newman, "Judicial Intervention in Correctional Decisions: Threat and Response," 14 Crime and Delinquency 1 (1968). See also The President's Commission on Law Enforcement and Administration of Justice, Task Force Report on "Corrections," p. 83.

conferences held since the evidentiary hearings, we will grant defendants' motion for summary judgment but only on the equity claims.

■ That motion will be granted with the single exception that defendants or their employees will be ordered to return plaintiff Owens' Koran to him. Plaintiff Owens prefers the Moslem religion of a Middle Eastern branch, and deprivation of his holy book is an interference with his right to freely practice his religion; defendants have given no explanation at all of why this book should not be returned.

Plaintiffs will confer with their counsel to determine whether they wish to pursue their separate actions for damages. If plaintiffs decide they wish to pursue their damage claims before a jury, counsel for the plaintiffs will file a separate amended complaint in each case. Such amended complaint shall state in detail the factual basis for the complaint against each particular named defendant.

The pending motions to dismiss filed at the request of and by counsel for plaintiff Westberg in No. 1089 and Faulkner in No. 1106 will be granted in our formal order. We have satisfied ourselves that plaintiffs' requests for dismissal were voluntarily made with full knowledge of their rights.

For the reasons stated it is

ORDERED that the respective complaints of plaintiff Westberg in No. 1089 and plaintiff Faulkner in No. 1106 should be and are hereby dismissed with prejudice. It is further

ORDERED that plaintiff Owens' Koran be returned to him for use by him as any other inmate is permitted use, for example, of the Bible. It is further

ORDERED that defendants' pending motion for summary judgment be granted only in regard to the equitable claims heretofore severed and that it be denied in all other respects. It is further

ORDERED that plaintiffs be given thirty (30) days within which to file an amended complaint in which a claim at law may be alleged in accordance with what has been stated above. It is further

ORDERED that in the event any of the plaintiffs indicate a desire to have their claims for damages tried before a jury by the filing of an amended complaint, the Court will direct further appropriate pretrial proceedings in connection with each separate claim.