**Robert Jewell LANDMAN et al.**

v.

**M. L. ROYSTER, etc.**

**Civ. A. No. 170-69-R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 31, 1973.

See also D.C., 354 F.Supp. 1292.

Philip J. Hirschkop, Alexandria, Va., for plaintiffs.

Vann H. Lefcoe, Asst. Atty. Gen. of Va., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This matter presents the question of whether Virginia prisoners, who in violation of their constitutional rights were subjected to cruel and unusual punishment by Virginia prison authorities, may recover damages from their jailers. Five named plaintiffs in the above styled action seek damages, to-wit: Robert Landman, LeRoy Mason, Thomas Wansley, Calvin Arey and Roy Hood.

The history of this litigation is long and complex. Briefly, the named plaintiffs brought this action pursuant to 28 U.S.C. §§ 1343, 2201 and 42 U.S.C. §§ 1981, 1983, 1985, on behalf of themselves and the plaintiff class of Virginia prisoners to redress alleged unconstitutional practices by the Virginia prison authorities, specifically with respect to administrative sanctions. The named defendants in the original complaint were the Director of the Department of Welfare and Institutions (Otis Brown), Director of the Division of Corrections (W. K. Cunningham), the Superintendent of the State Farm (M. L. Royster, now deceased), and the Superintendent of the Virginia State Penitentiary (C. C. Peyton, now deceased). These defendants were named individually and in their representative capacities.

The trial of this action originally took several weeks and encompassed the testimony of numerous prisoners and prison officials. This Court concluded that "the evidence adduced has disclosed as to each of these points a disregard of

constitutional guaranties of so grave a nature as to violate the most common notions of due process and humane treatment by certain of the defendants, their agents, servants and employees." Landman v. Royster, 333 F.Supp. 621, 626 (E.D.Va.1971). Based upon findings of widespread constitutional abuse, the Court entered an injunction prescribing administrative procedures which would hopefully safeguard the constitutional guaranties of the plaintiff class. The Court herein specifically incorporates by reference, except as discussed below, said findings of fact and conclusions of law as contained in its order and memorandum of October 30, 1971.

The named plaintiffs are now before the Court in an effort to procure damages for the treatment to which the Court has previously found they were subjected. Upon a hearing, additional evidence was adduced, specifically with regard to the question of damages. The parties have submitted numerous documents, memoranda and have additionally been heard on the legal issues raised. The Court has carefully studied all the evidence, and upon same finds this matter ready for disposition.

## I. FINDINGS OF FACT

### A. The Named Plaintiffs.

*Robert Jewell Landman*

In its memorandum of October 30, 1971, the Court made the following findings of fact with respect to Landman. Though given the opportunity to revise these findings, the evidence recently adduced does not prompt the Court to so alter them, and same are the basis upon which the Court will assess damages, *infra*.

> Landman, a prisoner now released from the Virginia system after having served his full term on August 28, 1970, had been technically eligible for parole for six years prior to his release.

> Commencing in 1964, Landman embarked upon a career, well known to this Court, as a writ-writer. The evidence before the Court is that between that time and the time of his release, on behalf of himself he filed a minimum of 20 suits, and it is estimated that in addition he assisted fellow inmates in approximately 2,000 petitions.

> Landman's troubles with the prison authorities apparently commenced with his having written a letter to one of the local newspapers, for which he served 20 days in solitary confinement. This was followed with correspondence to the then Governor, and in 1964 he was sent to what is known as the "C" Building and placed in punitive segregation where he was held for a period of 150 days. He was removed from there and put in the general population until January 1965 when he was moved to a prison camp. His move from the penitentiary to the camp came the day before he was due to confer with a local attorney.

> His reassignment to the penitentiary from the camp undoubtedly came about by reason of his having by then commenced his writ-writing endeavors, and in May 1965 it was recommended that he be placed in the "C" Building for his efforts in that regard. In "C" Building his life appears to have been a series of transfers to and from solitary confinement. In at least one instance he was put in solitary confinement for 58 days and never given any reason whatsoever for this confinement. [In 1965 alone he spent 140 days in solitary confinement.]

> Apparently for assisting another prisoner in preparing a writ in 1966, he was once again put in solitary confinement.

> This Court finds that up to November 1966, the man was punished 16 times and had good time taken from him once. He served a total of 266 days in solitary confinement and 743 days on padlock. [The Court further finds: He was deprived of mattress and blankets for 13 days and his mattress for an additional 36 days. He

was on bread and water diet for two of every three days in solitary confinement.]

In August of 1968, this Court entered a consent injunction enjoining the prison officials from denying inmates of the Virginia State Penitentiary certain of their rights. The day following the injunction, Landman was once again put in solitary confinement for a period of 40 days, allegedly for conferring with another prisoner. Landman's attempts to contact his lawyer were to no avail. From March 15, 1969, to July, Landman was placed on what is known as "padlock," wherein a padlock is placed on a particular cell so that when all other cells are opened electronically, that particular cell remains closed.

In short, the Court finds that there was imposed upon Landman over 265 days of solitary confinement and in no instance did he receive even the rudimentary elements of a hearing or opportunity to defend any allegations made against him. The Court is satisfied that Landman's exercise of his right to file petitions with the courts, and his assisting other prisoners in so doing, were the primary reasons for the punishments put upon him.

Landman's testimony at the recent hearing is very much a recount of the above quoted findings. Plaintiff's counsel made, additionally, a concerted effort to draw from Landman his feelings and emotions as prompted by the series of incidents recited. Not unsurprisingly, Landman conveyed feelings of continual fear and frustration.

The indignities to which Landman was subjected can be illustrated in greater detail:

*Fall of 1965:*

1. He was placed in solitary by Guard Spann for pointing at him.

2. He was refused writing paper by the guards and subsequently had a pending suit dismissed for failure to make timely compliance with a Court order.

3. He was placed in solitary for "misuse" of writing paper.

*December 1965:*

4. Landman alleges, and the Court finds, that defendant Peyton threatened him with continued confinement to "C" Building although he never possessed weapons, never attempted or planned an escape.

5. His cell was searched by guards almost daily and legal papers were removed.

*January 1966:*

6. He addressed an envelope for an illiterate prisoner, which envelope was torn up by Guard Spann.

7. Landman lost weight from prolonged confinement in solitary but was not given a medical checkup.

*February 1966:*

8. He was put in solitary for some time without a mattress.

*Spring 1966:*

9. Guards removed legal pleadings from his files and he was told by guards, "someone should do something about you."

10. A suit was filed against Guard Spann for improper treatment. Landman was thereafter placed in solitary confinement for 17 days.

*August 1966–March 1967*

11. Landman was kept on padlock, confined to his cell, virtually isolated.

12. Repeated complaints to the penitentiary superintendent were allegedly answered with remarks to the effect that defendant Cunningham was personally directing his case and thus was out of the hands of the local prison officials.

*September 23, 1968:*

13. Landman was assaulted by another prisoner and beaten unconscious as guards "looked the other way."

In all, Landman was confined to solitary 11 different times, during which he was not afforded medical treatment nor given hearings prior to confinement.

Both counsel have adduced expert psychiatric testimony in an effort to show the adverse effects, or lack of them, that may have flowed from continual solitary or isolated confinement. The substance of the testimony is neither contradictory nor surprising: even a lay person could be expected to fairly deduce that the repetitious pattern of treatment to which Landman was subjected would have adverse psychological effects. Nevertheless, a discussion of that testimony is warranted.

Plaintiffs' expert, Dr. Abse, is a psychiatrist with extensive experience in treating released prisoners of war. Specifically, he did much work with British soldiers released after World War II from Japanese prisoner of war camps and has since studied effects of isolated confinement upon civilian prisoners. Based upon his experience, he was able to generalize several typical patterns of reactive behavior, which patterns he labeled as symptomatic of "Traumatic Neuroses." The underlying cause of said behavior, he stated, was repression of emotions caused by isolation, fear and frustration. Symptoms associated with this type of neurosis include anxiety, destructiveness, easy fatigueability, diminished sexual potency, as well as psychosomatic illness (including gastric disorders, choking, headaches and backaches).

Dr. Abse personally examined Landman and concluded thereupon that he possessed these symptoms. He ascribed to Landman's travails severe physical and phobic injuries which evidenced themselves in the form of traumatic neuroses. While Dr. Abse stated that Landman undoubtedly had neurotic symptoms prior to incarceration, his incarceration at the Virginia State Penitentiary exacerbated his illness when in fact proper rehabilitation, including psychiatric care, might have cured it. Dr. Abse added that the effects of solitary confinement were aggravated by the diet which was given Landman during those times, i. e., recurring cycles of bread and water for two days, reduced meals a third day.

Interestingly enough, he concluded that solitary confinement beyond a two or three week period would have definite adverse effect upon most people.

It was the opinion of Dr. Abse, and the Court concurs, that Landman was presently in need of psychiatric care, which care would, he estimated, cost approximately $9,000.00. The Court, of course, recognizes the speculative nature of the estimated cost of psychiatric care and hence does not accept the quoted figure as definitive and certain, but simply cites it as illustrative of the nature of at least the quantity of psychiatric care which Dr. Abse felt was required to assist Landman.

■ Defendants' expert, Dr. Tice, was also eminently qualified. He did not personally examine Landman, but did conclude on the basis of observation of the maximum security and solitary cells that adverse effects caused by confinement therein depended on the relative degree of isolation from human contact in which the prisoners were held. He did admit, however, that such conditions as Landman was subjected to could have deleterious effects. While he did differ with Dr. Abse on the exact definition of Traumatic Neuroses, he did not in any way specifically contradict Dr. Abse's medical findings or conclusions. Accordingly, the Court finds as fact that Landman was caused to suffer severe psychic and physical injuries by virtue of the constitutional deprivations to which he was subjected.

*LeRoy Mason*

The Court, as with Landman, specifically adopts its prior findings with respect to Mason. They are as follows:

LeRoy Mason [now released from prison and a local TV executive, was] admitted to the Richmond Penitentiary in 1965. [H]e had no noteworthy clashes with prison authorities prior to 1968. In early 1968 Mason was known by the authorities to have contacted an attorney concerning certain prison conditions, in particular the alleged segregated nature of the State

Penal System. In July 1968, while he was working as a Chaplain's Assistant at the penitentiary, there came about an inmates' non-violent strike or work stoppage. The Court finds that Mason had no prior knowledge of the work stoppage.

The then superintendent, Peyton, suggested that the prisoners go to their respective work places and elect several spokesmen with whom he would confer. Of those spokesmen Mason was elected as an inmate representative, and generally he spoke for those representatives and met with Superintendent Peyton several times, but continued to perform his regular job. By that time Mason was a named plaintiff in a class action suit pending in this Court for the purpose of requiring a racial desegregation of the Virginia Penal System.

On July 19, 1968, four guards came to Mason's cell, handcuffed him and took him to the isolation cell block in the prison hospital where he remained in what amounted to solitary confinement for approximately a month. It is to be noted that another spokesman, one Pegram, met the same fate. Prison records indicate that the transfer of Mason was allegedly for refusal to return to work, for his own protection, and in an effort to keep him incommunicado. No hearing in regard to this punishment was held and he was kept in an isolation cell for approximately thirty days.

Shortly after being released from isolation he was transferred on August 20, 1968, to the maximum security lockup, i. e., C–cell segregation block, and was held there until April 27, 1970. In addition, it was ordered that he lose ninety days good conduct time.

The Court finds that he was not accorded any hearing, and in addition his release from maximum security had been recommended for some time prior to his actual release from same. The record is devoid of any valid reason as to why he was not released

sooner. While the Court is not fully apprised as to the use of punishment report forms in the prisons, it notes with some interest that the report of Mason's August 20th transfer to C–cell was apparently received by the Superintendent's office on August 19th.

While much disciplinary action was accorded many of the prisoners without notice or hearings and for reasons still vague to the Court, and in some instances simply upon the whim of a guard, in the treatment accorded Mason the record is devoid of any justification, and the Court is therefore satisfied that his punishment was attributable to his instituting an action in this Court for purposes of desegregating the Virginia Penal System.

Superintendent Peyton had stated that he could not say for sure whether Mason had stopped work during the strike. According to Peyton's explanation Mason was put into isolation only to keep him out of danger and contact with other inmates. Yet in spite of the uncertainty expressed by Peyton concerning any alleged work stoppage by Mason, ninety days good time penalty was imposed for allegedly refusing to work.

In late 1969 in spite of recommendations of the prison staff that Mason be released from maximum security, Cunningham refused to go along with the recommendation apparently on the basis of Peyton's reports that Mason had been a strike ringleader. Mr. Cunningham's justification for the continued refusal to air these charges in a hearing was based on the grounds that an emergency condition still persisted at the penitentiary. The proffered justification for Mason's segregation confinement and loss of good time is so specious as to add weight to the Court's conclusion that he had been penalized for his participation in a law suit begun in January 1968 in this Court in which he sought and

achieved the desegregation of the Virginia Penal System.

Mason testified at the recent hearing that the isolation cell to which he was confined was roach infested and hot (approximately 100°). He was initially placed naked in the cell and provided with a leather covered mattress from which roaches regularly exited and crawled onto his body. (He testified, understandably, to recurrent nightmares of this scene.) A compassionate guard thereafter replaced that mattress with a urine soaked cloth mattress, which Mason could only stand to sleep on for short periods. He was given clothes thereafter.

Mason spent his time in that cell killing roaches (he stopped counting at 1,084) and piling them in the corner of the cell; later by playing solitaire with cards made with 52 sheets of toilet tissue and a burnt match; and finally by daydreaming and fantasy. He spent over one month under these conditions. He was then placed in segregation for 22 months.

As in Landman's case, Mason testified that direct control of his punishment was exercised by defendant Cunningham.

Throughout this 23 month period Mason suffered reduced meals, (including the bread and water pattern in solitary), reduced commissary privileges, limited religious services, fear of whether his legal mail was getting through the prison.

Mason's testimony stands uncontroverted on the record (with the possible exception of Cunningham's role, discussed below).

On the basis of the foregoing, the Court finds that Mason suffered psychic and physical injury by virtue of the treatment he was subjected to.

*Thomas Wansley*

The Court's findings as to Thomas Wansley, as presented in the memorandum of October 30, 1971, are as follows:

Wansley, serving a life term, had apparently been in no difficulty prior to the strike in July 1968. He, like Mason, was one of the original parties in the suit filed in February 1968, for the purpose of desegregating the penitentiary. Wansley was one of several hundred inmates who refused to work on July 18th at the time of the alleged work stoppage. The Court finds that shortly therafter he did request an opportunity to return to work. As a consequence of his actions he was placed in solitary confinement from July 1968 to August 1968 and kept in a cell for a period of ten months.

The Court is satisfied that, unlike Mason, Wansley knew of the contemplated work stoppage. It is of particular note that Wansley remained confined for some considerable period after other striking prisoners were returned to their regular duties. It is a fair assumption, and the Court finds, that the reason for this was his actions in the suit to desegregate the Virginia Penal System.

Penitentiary records indicate that the padlocking of Wansley was allegedly for "agitating" by advising other prisoners to file suits contesting their treatment and by telling others, after his return from Court on August 13, 1968, that guards were barred from using tear gas against them and, apparently according to him, would be jailed if they did. Wansley, the Court finds, was never formally confronted with this alleged charge of agitation and never saw the prison reports prior to the trial of his case. In short, he was put under padlock on the basis of reports that he was yelling in the cellhouse and "agitating." The witness Oliver recalled no details save that Wansley had not been violent. Peyton, in February 1969, made no effort to justify Wansley's detention beyond saying "in his judgment" he should be confined.

Not as articulate as either Mason or Landman, Wansley was unable to testify

as clearly as to the effects upon him of ten months of continual isolation. The Court, nevertheless, based upon the testimony of Dr. Abse and its findings with regard to the more well-spoken plaintiffs, finds that said isolation, with the concomitant loss of privileges, lack of human contact and frustration over the powerlessness to redress this wrong, did have adverse psychic and physical effects on Wansley's health from which damages may flow.

*Roy Hood*

The Court's prior findings with regard to Hood, who is now released, are as follows:

Hood had been in the penal system continuously since 1963 and in at least two instances escaped from road camps and undoubtedly has admittedly caused difficulty, in some instances, during his stay, although in at least one instance he had been made a trusty. Some of the punishment accorded Hood, such as allegedly for refusal to work, fails to show up on the records kept by the authorities.

While in most instances Hood knew of the reason for a particular punishment, the Court finds that he has been put in "the hole", or solitary confinement, in some instances without benefit of any opportunity to be heard as to whether the punishment was either deserved or appropriate. He has lost good time under the same circumstances.

From January 1967 to November 1968 this particular prisoner was apparently devoid of any particular problems until he conferred with an attorney, and within eight days thereafter he was transferred to the penitentiary. Interestingly enough, the attorney with whom he had conferred was the same attorney who was representing the inmates in their suit to desegregate the penitentiary. The attorney had conferred with Hood and one Lambur, and had asked the prisoners to send him information concerning alleged tear gas incidents which might

be useful in a case he was then litigating. The same day of the conference prisoner Lambur was incarcerated in a high security section and, as heretofore stated, eight days later Hood was transferred to the penitentiary and put in a padlocked cell. No satisfactory reason for the treatment accorded these men has ever been given. The response received to his several inquiries as to why he had been accorded the treatment referred to was a brief notation from an official to the effect that Hood knew the answer as well as he did.

The files reflect a letter from the Director indicating that Hood and others had been sent to the penitentiary as a result of "agitation" that they were allegedly committing among State Farm inmates. The evidence before this Court shows that the agitation apparently was Hood's inquiries about tear gas incidents.

On March 31, 1969, guards took an inmate named Hargrove from a cell near Hood in a fashion that Hood thought was rough. On that same day he wrote to an attorney—the same attorney with whom he had conferred at the State Farm—and in this letter he wrote of the alleged rough treatment and remarked about alleged poor medical care. The following day he was placed in B–basement, a high security area. That the prison authorities imposed summary punishment on Hood for exercising his right to communicate with an attorney about conditions of confinement is clear. As a consequence he remained in B–basement for thirteen months.

Hood's recent testimony added a detailed account of a January 1964 incident, at which time tear gas was shot in his face after he refused to leave a jail cell allegedly out of fear for his life.

Although the Court finds that Hood was subjected to arbitrary treatment, it nevertheless remains that many of the initial problems were precipitated by his own misconduct. Hood's history shows

he was an escape risk and possessed at times of behavior problems. Maximum security confinement therefore may, aside from the individual instances of brutality, have been justified. In addition, aside from the transfer from the State Farm to the penitentiary, there is little evidence of direct involvement by the named defendants (see discussion, *infra*). The Court accordingly finds that Hood has not shown by a preponderance of the evidence that he has suffered damages as a result of unreasonable and arbitrary conduct of the defendant prison authorities.

*Calvin Arey*

The Court's initial findings with respect to Arey are as follows:

Arey was placed in solitary confinement on December 6, 1965. Although the record is devoid of any accounts of violence on the part of Arey, he had with justification been considered an escape risk and remained in "C" Building for a period of more than 4½ years until released into the general population in July 1970. At least twice while in maximum security he was placed in solitary confinement, one of the times for allegedly discussing with Landman an order of this Court, and he, like Landman, was transferred to solitary confinement for a period of 42 days during which time neither of them was permitted to file legal pleadings or to send letters to courts or attorneys; and in one instance he was placed in solitary confinement for reading to inmates a letter that he had received from a state senator. No notice or hearing of any kind was held in regard to these punishments, nor in regard to his loss of good time which he sustained. It would appear from the evidence that Arey's good time was taken on the basis of information received from a guard and upon the recommendation of the Assistant Superintendent that his good time be taken. Not even the rudimentary elements of a hearing or opportunity to be heard was given

this man prior to the taking of good time.

The fact that some of the matters which gave rise to the many punishments received by Arey may well have been factually accurate can in no way be used as an excuse for the failure to accord him due process.

The record abounds with evidence of Arey's attempts to communicate with attorneys, only to be subjected to delay or frustration. In at least one instance Arey was forbidden by the Superintendent to communicate with an attorney who was not then currently representing him. Perhaps the most striking example of the indignities suffered by Arey is exemplified by an incident which occured on August 13, 1968. On that day radio news reports gave an account of this Court's injunction against the employment of certain methods of punishment in the state prisons. According to the punishment reports submitted by guards, Arey yelled to other inmates concerning the Court order, telling the population of "C" Building generally that tear gas and the taking of bedding had been prohibited. Arey's commitment to solitary for this was approved by Superintendent Peyton who, so far as the evidence before this Court shows, failed to check out the account of the occurrence with anyone who had been allegedly present. The prison records as to this incident show the spaces on the form designed to record the members of the disciplinary panel who heard the case to be blank. Obviously no hearing was held. In fact it was standard practice at that time, the Court finds, to discipline men in C–cell without any hearing. On occasion, according to the testimony of R. M. Oliver, a committee might sometimes be used.

Arey was released from his isolation on September 23rd. That same day he found on his cell cot a letter he had tried to send to an attorney on August 14th; permission to mail it had been refused. He, of course, had been de-

nied leave to write counsel during his solitary confinement.

The record shows that a letter went from Superintendent Peyton going to Director Cunningham, which indicates as well that copies of this Court's order mailed by an attorney to certain prisoners were intercepted apparently on instructions of an Assistant Attorney General.

It was three days after his release from meditation, where he had not been allowed to shave, brush his teeth or comb his hair, and after having been on a bread and water diet for two days out of three while incarcerated in a cell which contained only a sink and a commode, and, in the night, a mattress and two blankets, that he wrote a letter to a state senator which ultimately was returned to him without having been mailed. The letter, which concerned penitentiary conditions, was taken to R. M. Oliver who disapproved this correspondence. No satisfactory explanation for this action has ever been received.

In 1969 Arey received a copy of a letter from a state senator which he read aloud to another inmate. While there is some dispute over how loud he spoke and what extemporaneous remarks he added, as a consequence a guard filed a punishment report. While no hearing was held, Arey lost all accumulated good time and stayed in meditation until February 5, 1970. The effect of the loss of good time was to extend his term by a year and eleven days.

The Court is initially presented with the same factors as those with respect to Hood. Arey was an escape risk. Confinement to maximum security, therefore, *per se*, might have been justified even if the above related incidents of denial of due process were not. The gravamen of Arey's problems, in addition, is more properly his difficulty in communicating with attorneys and non-prison officials. Arey now has a suit pending before the Court on this matter,

see Arey v. Oliver, Civil Action No. 110–70–R, and these issues are more fully raised therein. The Court at this time, however, finds that Arey has not shown by a preponderance of the evidence that allegedly sustained injuries derive from arbitrary conduct of the prison officials which was in fact disassociated with his own misconduct.

**B. The Named Defendants.**

*W. H. Cunningham*

Defendant Cunningham has been the Director of the Division of Corrections since 1965, and associated with the Virginia penitentiary in one capacity or another for many years prior thereto.

Cunningham testified that, *contra* to plaintiffs' accusations, he did not personally control their individual punishments, that in fact said punishments were determined directly by the prison superintendents who were under his command.

However, he did modify this generalization of noninvolvement with the following forthright admissions:

1. He "was probably aware" of some of Landman's punishment. Cunningham later admitted definite knowledge of at least some of these incidents and that he deemed them proper.

2. He would have to approve, under then existing policy, all confinements to solitary for more than 30 days. Presumably therefore Cunningham personally approved those extended confinements complained of.

3. He knew of the bread and water regime and thought it proper, though said regime was usually discontinued after 30 days.

4. He was informed by Peyton that Mason was to be confined to the particular solitary cell heretofore described.

5. He approved the Mason and Wansley punishments and agreed with them.

6. Changes were made in the mode of operation of C–Building, but said changes were not directly tied to Judge Sobeloff's opinion, Landman v. Peyton,

370 F.2d 135 (4th Cir. 1965), in which the Court of Appeals for the Fourth Circuit specifically commented on the odious nature of some of the facets of operation of C–Building. (Discussion *infra*).

Additionally, plaintiffs' counsel on cross-examination asked Cunningham, "Where does the buck stop?" Cunningham in admirable candor replied that being in charge of the Division of Corrections, he took all responsibility for actions taken under his command. That admission merely states a conclusion of law in the nature of *respondeat superior*. The Court, however, finds that Cunningham's involvement transcends questions of agency relationship. Cunningham, by virtue of personal knowledge, and, in instances, affirmative action, was directly a party to the incidents complained of by Landman, Mason and Wansley. He approved and personally cooperated in the actions of his subordinates, and by his actions encouraged the treatment accorded the plaintiffs. This finding of direct personal involvement is supported as well *inter alia* by the specific findings as they relate to each prisoner, *supra*, and by further findings made by the Court on October 30, 1971, and incorporated herein by reference. The Court is fully satisfied, despite Cunningham's denials to the *contra*, that Landman was indeed treated under direct authority of Cunningham. His constant assertion of legal rights obviously resulted in what Cunningham and other prison administrators considered to be creative of a bad image for the institution. The Court is more than satisfied from the evidence that deliberate efforts under direction of Cunningham were made to de-humanize Landman.

### Otis Brown

Brown, from November 1966 to July 1972, was the director of the Department of Welfare and Institutions, a State cabinet level agency with primary jurisdiction over the Division of Corrections and a total of 37 institutions. The Court's findings with respect to Brown differ from those concerning Cunningham. The Court finds that Brown had knowledge of several of the practices complained of, e.g., bread and water diets, and indeed approved of same. He was also aware of the general conditions extant in "C" Building, from both reports of administrative personnel and occasional visits.

Nevertheless, the Court finds that Brown had no direct responsibility for any of the actions complained of. Any liability sought to be imposed upon Brown would necessarily, therefore, rest upon the doctrine of *respondeat superior*. Questions raised thereby, however, are rendered moot by counsel for the plaintiffs' concession, upon oral argument in response to the Court's indication that a case against Brown had not been sustained, not to further proceed against Brown. Further findings with respect to this defendant, therefore, are rendered unnecessary.

### C. C. Peyton and M. L. Royster

The Court's memorandum of October 30, 1971, contains numerous findings of fact with respect to these defendants. Both, however, are now deceased. For reasons stated *infra*, and because counsel for the plaintiffs conceded the issue, the claim against these defendants does not survive. The Court therefore need not concern itself with further findings of fact in regard to them.

## II. CONCLUSIONS OF LAW

The Court has heretofore found that Landman, Mason and Wansley suffered compensable damages by virtue of Cunningham's actions. The question remains, however, as to whether the plaintiffs may under the law recover damages and, if so, from whom. The numerous legal issues raised thereby are as follows:

### A. *Statute of Limitations and Res Judicata*

The Court is faced at the outset with the issue of whether any or all of the plaintiffs' claims are time barred.

■ The Court of Appeals for the Fourth Circuit held in Almond v. Kent, 459 F.2d 200 (4th Cir. 1972), that Virginia's two year statute of limitations applies to actions in this state for personal damages brought pursuant to 42 U.S.C. § 1983 jurisdiction. While *Almond* deals specifically with § 1983 only, and the plaintiffs here have attained jurisdiction as well under other aforementioned jurisdictional statutes, the Court concludes that the rationale of *Almond* nevertheless applies to the matters presently before the Court. The rationale is that § 1983 claims create a federal right to redress personal injuries inflicted under color of state law, so that the Virginia Statute of Limitations, 2 Va.Code Ann. § 8–24, which places a two year limit on "every action for personal injuries" applies thereto. In the instant action, therefore, the *Almond* rationale guides the Court to the conclusion that the plaintiffs' claims for personal injuries, despite the enlarged jurisdictional bases, are governed by the Virginia two year time limit.

The plaintiffs commenced this action on April 30, 1969. Accordingly plaintiffs are barred from asserting any claims here which, under principles of the law of limitations, were mature prior to April 30, 1967.

It is immediately clear that Mason's claim was timely, his difficulties spanning the latter half of 1968 through April 1970. The same is true with respect to Wansley.

An additional question, the effect of a prior judgment, exists with respect to Landman. Although many of the incidents complained of by Landman occurred subsequent to April 1967, some, nevertheless date back to 1964. On March 11, 1965, Landman filed an action, Landman v. Peyton, *supra,* appellate decision reported in 370 F.2d 135. (The findings of the District Court by Judge Butzner are unpublished.) In that action, Landman complained of the

treatment accorded to him prior to the date of filing, including:

1) Confinement in solitary on five different occasions.

2) Denial on several occasions of "writ paper."

3) Searches of his cell.

4) Refusal of prison officials to transmit his mail.

5) Transfer to another institution to prevent his counseling with an attorney.

The findings of Judge Butzner are substantially in accord with this Court's findings as to those same events, but as to each of these complaints, the learned district judge found that Landman was not subjected to cruel and unusual punishment. The Court noted at that time, "the law in this field is evolving," but, duty bound to follow the precepts of its appellate court, concluded that the actions complained of were, as of that time, constitutionally permissible. The Court of Appeals for the Fourth Circuit reached the same legal conclusion, but expressed its reservations as to same. 370 F.2d at 139.[1]

■ Although the law has since evolved so as to proscribe some of the practices attacked, see Landman v. Royster, *supra,* 333 F.Supp. at 621, this Court is nevertheless bound to the Court's prior determination of Landman's pre-1965 claims in Landman v. Peyton, *supra.*

It is clear, however, that the treatment Landman was subjected to continued and, apparently, even accelerated following his March 1965 suit. Landman was punished with solitary confinement on six separate occasions after that date. The Court has specified, by way of illustration, some of this treatment from the Fall of 1965 on, *supra.*

The testimony of Dr. Abse has shown that Landman's psychic disorders resulted from a continual pattern of treatment. Though by virtue of Landman v. Peyton the defendants are not liable for

---

1. It should be noted that the Court of Appeals' affirmance was apparently based primarily on the trial court's factual findings.

damages suffered by Landman prior to March 1965, they are nevertheless, in evaluating his present damages, burdened with his pre-existing disabilities:

> One who is liable for negligently inflicting personal injuries on another is responsible for all the ill effects, which, considering the condition of health in which the plaintiff was when he received the injury, naturally and necessarily follow such injury. A defendant's liability is in no way lessened or affected by reason of the fact that the injuries would not have resulted had the plaintiff been in good health, or that they were aggravated and rendered more difficult to cure by reason of the fact that he was not in good health. Doubles, Emroch and Merhige, Virginia Jury Instructions, § 23.04 (1964). See Watford v. Morse, 202 Va. 605, 608, 118 S.E.2d 681, 683 (1961); Ragsdale v. Jones, 202 Va. 278, 282, 117 S.E.2d 114, 118 (1960).

Though the Court is not here concerned with negligence itself, the reasoning is appropriate. As stated in an old maxim, "Tortfeasors take their victims as they come."

██ With respect to the statute of limitations question, the Court has found that Landman was subjected to a continual pattern of unconstitutional punishment, the damages for which arise from the cumulative impact of his isolated confinement rather than from individual episodes thereof. The continuous nature of this subjugation after March 1965 brings Landman within the well settled exception of the law of limitations, to-wit: when injury is caused cumulatively by a continuing wrong, the statute of limitations begins to run when the wrongful action ceases. See Baker v. F. & F. Investment et al., 420 F.2d 1191 (7th Cir. 1970).

The traumatic neurosis suffered by Landman results not from individualized instances of tortious behavior, but from the continued frustration of six years of arbitrary, illegal and unjust treatment. . . . treatment calculated to dehumanize the man. Indeed, every illegal incident visited upon Landman simply accentuated and aggravated his condition existing immediately prior thereto. The impossibility of ascribing the cumulative damage to individualized instances under the above stated principle renders Landman able under the law to pursue damages arising during the entire period in question, March 1965 through his release in August 1970.

### B. *Survival of Action*

█ Because defendants Royster and Peyton are now deceased, question exists as to whether this action survives them and is maintainable against their estates. While some authority exists for the proposition that § 1983 actions do in fact survive, see Pritchard v. Smith, 289 F.2d 153 (8th Cir. 1961), that question appears settled here by the Fourth Circuit's rule of Barnes Coal Corp. v. Retail Coal Merchants Ass'n., 128 F.2d 645 (4th Cir. 1942). In *Barnes,* the Court of Appeals held that federally created causes of action in tort do not survive the death of a defendant unless the tort alleged is one "affecting property rights." Because the damages sought herein are addressed to tortious conduct affecting "personal rights," the action under the *Barnes* rule does not survive.

The plaintiffs' counsel, cognizant of this doctrine and of this Court's obligation to follow the law as set forth by its appellate court, conceded on oral argument that the estates of Peyton and Royster could not be proceeded against. Accordingly, the Court concludes that as a matter of law said estates may not be held liable for damages flowing from the actions of the deceased.

### C. *Liability of the State of Virginia*

█ Plaintiffs prosecuted this action against the defendants both personally and in their official capacity. Damages, however, may be recovered only from them personally, as a judgment against them in their official capacity would in essence be a judgment against the State of Virginia. Such an action

generally does not lie under 42 U.S.C. § 1983, since the State is not a "person" within the meaning of that statute. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Moreover, such a recovery is barred by the Eleventh Amendment, which prohibits suits against a State without its consent. Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). No evidence in this case indicates that the State consented to be sued.

### D. *Personal Liability*

In order to establish a *prima facie* claim for damages under the Civil Rights Act, the plaintiff need prove only two elements: that conduct complained of was engaged in under color of state law and that such conduct subjected the plaintiff to a deprivation of constitutional right. Johnson v. Mueller, 415 F.2d 354 (4th Cir. 1969); Marshall v. Sawyer, 301 F.2d 639 (9th Cir. 1962). Significantly, the plaintiff must prove actual conduct depriving him of his rights on the part of each defendant whom he seeks to hold liable. An official is not liable for the acts of his subordinates in the absence of some personal involvement in those acts on the part of the party sought to be charged. The requirement of personal involvement is met, however, not only when the superior personally directs his subordinates to do acts, but also when he has actual knowledge of their acts and acquiesces in them. Wright v. McMann, 460 F.2d 126, 134–135 (2d Cir. 1972); Mills v. Larson, 56 F.R.D. 63 (E.D.Pa., August 25, 1972).

Although a few courts have held to the contrary, *e. g.* Wright v. McMann, *supra,* the rule in this Circuit appears to be that the higher official cannot be charged with knowledge of his subordinates' acts when he in fact is not aware of them. Bennett v. Gravelle, 323 F.Supp. 203 (D.Md.), aff'd. 451 F.2d 1011 (4th Cir. 1971). It is thus the plaintiff's burden to prove that the de-fendant official had knowledge of and acquiesced in the allegedly unconstitutional acts. It would appear to the Court, however, that where an official closely supervises the work of his subordinates, it is both logical and proper for a court to infer knowledge on the part of the superior of the subordinates' acts. Such an inference is not one of law, but rather one of fact and may be rebutted by the superior. This inference and a shift in the burden of going forward would arise once the plaintiff establishes two facts: that the relationship of the superior to the subordinate is such that the superior would normally exercise reasonably close supervision over the other's job and that the conduct of the party actually inflicting constitutional deprivation was not an isolated, clandestine act which was likely to be hidden from the superior's attention. Thus, in general, the inference of knowledge would likely arise against a prison warden as to persistent acts by a guard, but would not arise against the state director of prisons as to those same acts. In either event, however, the final burden of proof would rest on the plaintiff.

In the original trial of this suit, this Court held that the constitutional rights of the named plaintiffs were in fact deprived under color of state law. Plaintiffs have thus established the two basic elements of a cause of action for damages under 42 U.S.C. § 1983. From the evidence presented to the Court in both the first and second hearings, the Court concludes that contrary to the general expectation, W. H. Cunningham not only had actual knowledge of the acts being perpetrated against the plaintiffs and acquiesced to them, but also that he directed actual, personal control over certain of those acts.

The Court has found that as of July 1970, an inmate could not be kept in solitary confinement for more than 30 days without the direct approval of Cunningham. Cunningham therefore had knowledge of and approved those protracted confinements complained of by

plaintiffs. Further, under the policy then existent, no man could be fed the bread and water diet without Cunningham's permission. Cunningham approved of this policy. Cunningham knew of and approved the punishments given to Mason and Wansley, described *supra,* and he deemed Landman's punishment proper.

Cunningham was aware of the conditions of confinement of the disciplinary quarters and admitted knowing that no intelligible guidelines governed their operation, as well as the taking of good time. The Court has also been presented with much evidence to the effect that Cunningham personally controlled the disciplining of the plaintiffs, much of which evidence is uncontradicted. See findings of fact, *supra,* and the Court's memorandum of October 30, 1971.

Accordingly, the plaintiffs have established a *prima facie* case for the recovery of damages against Cunningham.

As to Otis Brown, however, the plaintiffs have not made a showing of the sort of personal involvement needed to establish liability under § 1983. No evidence suggested that Brown exercised any control over the treatment afforded the plaintiffs. The evidence further indicates that Brown had only a vague notion of the day-to-day operations of the prisons and had no real knowledge of the treatment being suffered by the plaintiffs. Despite the fact that the conduct complained of was not isolated or clandestine, the Court is unwilling to draw an inference of knowledge on the part of Brown. His position at that time as State Director of Welfare and Institutions is too far removed from that of guards or wardens to infer that he had knowledge of their acts. Furthermore, although at that time Brown was Cunningham's immediate superior, the duties of his position did not demand the sort of close supervision of Cunningham's job as Director of Corrections that would cause an inference to arise. Accordingly, the Court holds that Brown is not liable to the plaintiffs.

The plaintiffs having established a *prima facie* case against Cunningham, it remains to be determined whether he has successfully established a defense that would relieve him from liability. The Court concludes that he has not.

Any suggestion that a party may be relieved of liability by showing that he had no intent or purpose to deprive the injured parties of their constitutional rights has been firmly rejected by the courts that have considered the issue. Daniels v. Van de Venter, 382 F. 2d 29, 31 (10th Cir. 1967); Anderson v. Haas, 341 F.2d 497, 501–502 (3d Cir. 1967). However, it is established that state officials such as police officers can successfully defend a § 1983 action for damages by proving that they believed their conduct to be constitutionally permissible and that such belief, given the state of the law at the time of the incidents, was reasonable. Pierson v. Ray, 386 U.S. 547, 555–558, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Bivens v. Six Unknown Agents, 456 F.2d 1339, 1347 (2d Cir. 1972); Daniels v. Van de Venter, *supra.* Although *Pierson* and the cases following it relied upon the prior common law as to police actions, the Court concludes that the same standard of care applies to § 1983 actions against prison officials. Throughout the lengthy litigation of this case, the Court has reiterated its recognition of the difficulty of defendants' jobs of running the Virginia prisons. As stated in *Bivens, supra,* in a somewhat different context, they "perform functions indispensible to the preservation of our American way of life." 456 F.2d at 1347. Particularly given the rapid changes in the laws governing prisoners and prisons that have taken place over the last several years, see generally, Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 57 Va.L.Rev. 841 (1971), it would be unconscionable to hold prison officials liable monetarily for acts which they could not reasonably have known were unlawful. Such liability would contravene basic notions of reasonable notice and fundamental fairness.

From all of the evidence before it, however, the Court concludes that Cunningham has not established that he had a reasonable belief that the practices which he directed and acquiesced in were constitutionally permissible. To the contrary, the Court finds that at least certain of the practices which have now been held in this action to be unconstitutional were of such a shocking nature that no reasonable man could have believed that they were constitutional.

Included among those practices are the following:

1. Imposition of bread and water diet.

2. The arbitrary use of tear gas.

3. The punitive practice of taping, chaining or handcuffing inmates to cell bars.

4. Extended periods of confinement in solitary confinement cells.

5. The selective denial of mattresses and blankets in solitary (forcing men to sleep on cement floors) as additional punishment.

6. Total confinement for periods of over one year to a padlocked cell with little or no opportunity for exercise or bathing.

7. Placing prisoners naked in a hot roach-infested cell.

8. Arbitrary removal of good conduct time thereby extending a man's compulsory prison term by months, and in Landman's case, by years.

9. Purposeful denial of all reading material, letter writing material, and human contact for months on end.

These and other practices described in findings of fact violate the lowest standards of decency and are even more odious when it is considered that they were approved and implemented by one of the State's highest officials in charge of rehabilitation.

Moreover, despite his protestations of ignorance, the Court finds that Cunningham had at least some notice that the practices which he directed and condoned were constitutionally suspect. He had not been performing his job in a vacuum, totally removed from the increasing awareness by courts of the rights of prisoners. In particular, the Court of Appeals for the Fourth Circuit in its 1966 opinion in Landman v. Peyton, 370 F.2d 135, had expressed its concern with the arbitrary and possibly cruel manner in which C–Building of the State Penitentiary was being administered. It noted expressly that "[w]here the lack of effective supervisory procedures exposes men to the capricious imposition of added punishment, due process and Eighth Amendment questions inevitably arise." 370 F.2d at 141. Given clear words such as these directed expressly toward the Virginia Penitentiary, the Court finds it incomprehensible that Cunningham could have been in such ignorance of the law as he now professes.

## III. THE MEASURE OF DAMAGES

The difficult question of apportioning damages remains. In the first instance, the Court is disinclined to allow punitive damages. In the light of the injunction now in effect, "The deterrent impact of a punitive award would be of minimal use." See Sostre v. McGinnis, *supra.* Compensatory damages are, however, warranted for the physical and psychic damages and suffering endured by plaintiffs. See Wright v. McMann, *supra.*

Fixing damages is difficult but not impossible. In United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (E.D. Pa.1972), the district court awarded damages of $25.00 per day and $0.60 per day lost wages for the plaintiff's illegal confinement to solitary. In United States ex rel. Motley v. Rundle, 340 F. Supp. 807 (E.D.Pa.1972), a default judgment was entered against the defendant prison authorities, for reducing a prisoner's job status. Compensatory damages were computed from wages lost

($461.70 over a three year period) to which was added $1,000.00 nominal damages. See Generally, Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). While these approaches are instructive, they are not binding on the Court.

The award of damages with respect to each of the plaintiffs is set forth below:

### Robert Landman

Landman is entitled to reasonable sums for the cost of future medical treatment, loss of prison wages to which he would have been entitled had he been treated in accord with constitutional mandates, and coupled with these items he is entitled to reasonable sums for pain and suffering and such lost wages as he may have incurred had he been treated as any other prisoner and secured release prior to having served every day of his sentence.

Landman was caused to serve every day of his sentence, parole or release being barred to him by virtue of his confinement to C–Building. As a result he lost up to six years of his life. He now earns $12,500 per year. There is, of course, no way of knowing what his salary might have been upon due release or how many years he would have had to enjoy it. Any estimate by the Court as to what his lost wages, if any, would have been would be just that, an estimate based upon speculation. While he may well be entitled to lost wages, the Court not being satisfied as to a method by which to ascertain same will not consider that in its ultimate award. Accordingly, the ultimate award contains compensation for pain and suffering with a view in mind to the disability inflicted upon him, the reasonable costs of medical treatment, and lost prison wages, the evidence showing that prior to his initial incarceration in solitary confinement he had been earning $0.40 per day. Up to the date of the findings of this Court in the unreported opinion which was the basis of Landman v. Peyton, 370 F.2d 135, *supra* (1966), Landman had been placed in solitary confinement five times and as to wages lost as a consequence thereof he has had his day in court. In considering the ultimate amount to be awarded Landman, the Court gives no consideration to the actual monetary loss sustained by him up to the date of the district court's findings in Landman v. Peyton, *supra*. He had lost the right of earning for a total of 994 days, of which, however, 236 occurred prior to 1966. Accordingly, considering all of the foregoing, the Court will award judgment against the defendant Cunningham in the amount of $15,303.20 as to Landman.

### LeRoy Mason

Prior to Mason's illegal confinement he earned $0.15 per day, which earnings were lost for a period of 23 months. In addition, he is entitled to reasonable sums for pain and suffering. Accordingly, considering all of the foregoing, the Court will award judgment against the defendant Cunningham in the amount of $3,605.00 as to Mason.

### Thomas Wansley

Prior to Wansley's illegal confinement he earned $0.35 per day, which earnings were lost for a period of 11 months. In addition, he is entitled to reasonable sums for pain and suffering. Accordingly, considering all of the foregoing, the Court will award judgment against the defendant Cunningham in the amount of $2,357.25 as to Wansley.

An order consistent with this memorandum shall enter.