**Michael JONES, Plaintiff,**

v.

**Thomas A. COUGHLIN, III, Commissioner, Department of Correctional Services, State of New York, et al., Defendants.**

**No. 86 Civ. 9888 (RWS).**

United States District Court, S.D. New York.

June 30, 1987.

The Jacob D. Fuchsberg Law Firm, New York City, for plaintiff; Bonnie Reid Berkow, Betsy C. Manifold, of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for defendants; Douglas D. Aronin, Asst. Atty. Gen., of counsel.

SWEET, District Judge.

In this action to recover compensatory and punitive damages for injuries incurred as a result of violations of Jones' civil and constitutional rights, all defendants but Rivenburgh and Farrell move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6).[1]

For the reasons set forth below, defendant's motion is granted in part and denied in part. With respect to those claims or parts of claims outside the applicable three-year statute of limitations, the motion is granted. Also, with respect to defendant Parole Board members Dean, Buchanan, and McNiff, the motion is granted. In all other respects, defendant's motion to dismiss is denied.

*Facts*

Plaintiff Michael Jones ("Jones"), a black male, brought this action pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988 and the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution against various administration officials, officers, and personnel of the New York State Department of Correctional Services ("DOCS") and the New York State Division of Parole ("Parole"). For the purposes of this motion, the facts as stated in the complaint must be taken as true. They are, in pertinent part, as follows.

Jones was incarcerated at Green Haven Correctional Facility ("Green Haven") between April, 1981 and May, 1984, and at Downstate Correctional Facility ("Downstate") from May, 1984 until his release on parole in July, 1985. While in prison, Jones studied law and became an activist for inmates' rights, working as an assistant in the prison law library, teaching a legal

---

1. Defendants Rivenburgh and Farrell are not represented in this motion. Hereinafter "defendants" will refer to all defendants but Rivenburgh and Farrell.

research class, and filing numerous grievances on behalf of himself and other inmates complaining of various due process violations.

In 1981, Jones became involved in an incident which led to his bringing a federal action against various Green Haven/DOCS personnel, in which he alleged violations of his civil and constitutional rights. The case went to trial in May, 1985, and the Honorable Kevin T. Duffy decided in Jones' favor, awarding him not only compensatory but also punitive damages.

This action stems from Jones' experience in the case before Judge Duffy. Jones alleges that DOCS employees retaliated and conspired to retaliate against him in order to harass him into dropping his lawsuit, and that such retaliation is part of *de facto* DOCS policy of punishing black and activist prisoners. Specifically, Jones has alleged the following actions as part of the retaliatory conspiracy.

On May 9, 1982, Jones was written up on a misbehavior report. According to Jones, the report used outdated code numbers only, with no other description of what Jones had done. He alleges that he received no meaningful notice of his offense, and that a hearing officer on the committee convened to rule on the charges was unfairly biased against him because she was at that time a defendant in the federal action before Judge Duffy. The officer refused to allow Jones to call witnesses in his behalf and he had no opportunity to face his accuser; Jones withstood two searches in connection with the hearing, the second of which he says was not standard but conducted to harass him. The hearing officer found Jones guilty and as a result he suffered five days "keep-lock" in his cell. Jones never received a copy of evidence used to find him guilty and in an attempt to have it reviewed never gained more than a perfunctory concurrence in the decision given.

On May 27, 1982, Jones was removed from the list of those eligible for new visiting room privileges for an unprecedented six months, ostensibly as a result of the described disciplinary action in combination with another keep-lock punishment, which Judge Duffy ultimately found to be a violation of Jones' due process rights. After a long, drawn-out attempt by Jones to acquire information on new visiting room guidelines and procedures (begun with a request dated June 29, 1982, on August 5, 1982), Jones received notice that no such guidelines yet existed. His grievances with regard to the matter were denied at the facility level, but the Green Haven administration ignored a Central Office Review Committee decision dated September 16, 1981 that abolished any policy allowing the new visiting room committee to remove inmate privileges.

Green Haven officials consistently denied all grievances which Jones filed over the course of his three years at the facility regarding the prison law library. Jones' grievances included denial of access to the library, insufficient assistance to inmates, delays in photocopying materials, lack of an on-going legal research class, lack of regular notary services, and hampering of communications between inmate legal assistants and inmates requiring aid with legal matters.

On September 8, 1983 Jones was confined in his cell in keep-lock status on the basis of charges that were later dismissed as false. Jones, however, had remained locked in his cell for five days before the dismissal. Jones began harassment proceedings as a result of the incident, which were dismissed.

On or about May 1, 1984, upon Jones' transfer to Downstate, approximately $100 worth of his property was confiscated. Also upon transfer to Downstate, Jones received assignment to pot washing, despite prior assurances of assignment to a law clerk position. Other alleged harassing, intimidating, and retaliatory activity included bringing Jones before an Adjustment Committee more than twenty-four hours after the alleged infraction in violation of mandated procedures, allowing an untrained official to function as a hearing officer who then withdrew Jones' commissary and package privileges for thirty days, simultaneously refusing Jones access to

stamps in his personal property thus interfering with his legal correspondence.

After Jones became eligible for work release in November, 1983, he applied for and received Temporary Release Committee approval for furlough and work release on December 22, 1983. Green Haven's superintendent vetoed the approval and DOCS' commissioner concurred in the veto. A second application submitted on or about May 13, 1984 for furlough and work release was denied, with instructions to reapply after September 1, 1984. Jones' third application of September 4, 1984 was again denied with instructions to reapply after his next parole board appearance. Given that the parole board had met on September 5, 1984, Jones, in effect, could not reapply for temporary release until September, 1985. Jones had appeared before the parole board on September 5, 1984 and had his application denied in spite of his being in excess of the eligibility range of 40–50 months (Jones had served 70 months as of September, 1984), his good institutional educational record and letters of reference, and his employment offers. The decision also made reference to non-existent alcohol therapy. Jones' appeals and grievances requesting investigation yielded non-conclusive results; the hearing committee consisted of the very officers complained of, and Jones declined the hearing. Jones obtained work release in January, 1985 and parole on July 31, 1985.

According to Jones, these acts are manifestations of the prison personnel's retaliation against him for seeking to vindicate his rights in court, and that as a result of the acts detailed, he has suffered deprivations of liberty, property and privileges, was falsely arrested and illegally detained, was denied access to the courts, and denied counsel. Jones also says that these acts infringed his right to fair and impartial hearings, imposed cruel and unusual punishment, denied him equal protection of the laws, and caused grievous mental suffering.

*Discussion*

## I. *Statute of Limitations*

The defendants maintain that many of the acts of which Jones complains fall outside the statute of limitations. Jones, however, argues that because some of the acts that he has alleged fall inside the statute of limitations, all the rest are properly allowed.

In *Okure v. Owens*, 816 F.2d 45, 49 (2d Cir.1987), the Second Circuit held that the single New York statute most analogous to the broad range of possible 1983 claims is N.Y.C.P.L.R. 214(5), which provides a three-year statute of limitations for general personal injuries sounding in tort. The state has not maintained that a different statute of limitations applies to 42 U.S.C. § 1985 actions so the three-year limit will be applied to those claims as well. This result is reinforced by the common purpose and close relationship between the two sections. Congress enacted the precursor of § 1983 on April 20, 1871 as the Civil Rights Act of 1871, 17 Stat. 13, the "Ku Klux Klan Act." As initially submitted, the bill contained two parts—the first of which constituted what is in effect today 42 U.S.C. § 1983, and the second of which composed substantially what is now § 1985. Although the parts evolved into separate sections, their common origin indicates the close relationship of both their purposes and the federal concerns which inspired them.

As the Second Circuit noted in *Okure*, "[the Supreme Court] instructs us to look beyond the nature of the section 1983 claim to the federal interest in ensuring that the borrowed period of limitations not discriminate against the federal claim." 816 F.2d at 48. Victims of civil rights violations deserve adequate time "to reflect and probe" matters which may not be immediately recognizable as valid federal claims. *Id.* at 49. Thus, as the *Okure* Court concludes, "the three year limit of section 214(5) more faithfully represents the federal interest in providing an effective remedy for violations of civil rights than does the restrictive one year limit of section 215(3)." *Id.* This reasoning applies equally to § 1985, and the court will apply the three-year statute of limitations for both §§ 1983 and 1985. However, the rules for when

actions accrue under the different statutes are different enough to require separate analysis.

As to the § 1983 claims, in *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981), the court held that "[c]haracterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as 'a single series of interlocking events' does not postpone accrual of claims based on individual wrongful acts." The time at which plaintiff becomes aware of an injury for which he or she may recover damages in a civil suit, is the moment the statute begins to run. *Id.* Specifically, "the existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, *not the conspiracy,* which is actionable whether that act is labelled a tort or a violation of § 1983." *Id.* (emphasis added). Consequently, under the rule of *Singleton,* no matter how recent the most current in a chain of constitutional torts, § 1983 violations committed outside the statute of limitations cannot be brought inside by an allegation of the existence of a conspiracy. *Singleton,* however, did not speak to § 1985, and a different set of concerns is operative.

 Unlike § 1983, where the tort, not the conspiracy, is the violation, § 1985 is specifically directed at conspiracy, and consequently requires a different analysis. The statute provides:

> If two or more persons ... conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy whereby another is injured in his

person or property or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(2), (3).

Whereas the length of the statute of limitations in an action is determined by reference to state law, the time of the accrual of a civil rights action such as this is governed by federal law. *Rawlings v. Ray,* 312 U.S. 96, 61 S.Ct. 473, 85 L.Ed. 605 (1941); *Singleton,* 632 F.2d at 191; *Kaiser v. Cahn,* 510 F.2d 282, 285 (2d Cir.1974). In the realm of civil conspiracy law, the question of the time of accrual of a cause of action is complicated, and the rules for civil rights conspiracies have largely been borrowed from the rules of accrual of actions for antitrust conspiracies. *See e.g., Kadar Corp. v. Milbury,* 549 F.2d 230, 234 (1st Cir.1977); *Hoffman v. Halden,* 268 F.2d 280, 302 (9th Cir.1959), *overruled on other grounds, Cohen v. Norris,* 300 F.2d 24 (9th Cir.1962).

The rule that the Supreme Court has set forth in the antitrust realm is: "In the context of a continuing conspiracy ... each time a plaintiff is injured by an act of defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of that act." *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). In other words, in a longstanding conspiracy to violate civil rights, a civil plaintiff will recover only those damages "caused by" the overt acts of the conspiracy that occurred within the period of the statute of limitations.[2] As the D.C. Circuit has said, "the statute of limitations in a civil damages action for conspiracy runs separately from each overt act that is alleged to cause damage to the plaintiff." *Lawrence v. Acree,* 665 F.2d

---

2. In *Kadar Corp. v. Milbury,* 549 F.2d 230, 235 (1st Cir.1977), the First Circuit seemed to go even further and hold that unless a defendant actively participated in an overt act within the statute of limitations period, the claim would have to be dismissed with respect to him. That issue has neither been raised nor briefed here, and will not be decided.

1319, 1324 (D.C.Cir.1981) (per curiam) (footnote omitted).

This rule is consistent with an earlier Second Circuit case cited by Jones, *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir.) (Lumbard, J.), *cert. denied*, 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956). The Court there wrote:

> The charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts. The person harmed by the conspiracy may bring suit as soon as the damage to him is inflicted; he obviously need not wait until the termination of the conspiracy which caused it. It is at the time of injury that the "right to relief by action" arises and *the statute therefore begins to run at the moment such injury occurs.*

*Id.* (emphasis added). Therefore, the statute of limitations clock starts anew with each act and accompanying injury with respect to that act.

Jones has also cited *Landman v. Royster*, 354 F.Supp. 1302 (E.D.Va.1973), in support of his proposition. The court there found that Landman, then an inmate in the Virginia prison system, was subject to "a continual pattern of unconstitutional punishment" in retaliation for writ writing and that the damages he sustained arose from the cumulative impact of the torts rather than the isolated instances. *Id.* at 1315. Because of this, the court ruled that the statute of limitations did not begin to run until the wrongful action ceased. *Id.* Landman had brought his action pursuant to both §§ 1983 and 1985 (as well as several other sections). *Id.* at 1304.

*Singleton* forecloses such a result for the § 1983 claims, and the vast weight of authority in other circuits does for § 1985 claims. Realizing that this rule creates the incentive for prisoners to sue at the first inkling of a conspiracy in order to avoid the harsh effect of the statute of limitations, Jones' claims arising out of acts outside the three-year period will nonetheless be dismissed.

The date of commencement of this action for the purposes of determining what acts fall within the statute of limitation is the date of filing in federal court, December 29, 1986. Although defendants maintain that commencement of the action for statute of limitations should be governed by New York law (under which an action is commenced by serving rather than filing), the Second Circuit ruled forty years ago that the federal rules govern the commencement of a civil rights action, *Bomar v. Keyes*, 162 F.2d 136, 140–41 (2d Cir.) (Hand, J.), *cert. denied*, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947), and that is still the law of this Circuit, *see Salahuddin v. Harris*, 657 F.Supp. 369, 374 (S.D.N.Y. 1987); *Cohen v. Board of Ed. of East Ramapo Central School*, 536 F.Supp. 486, 495 (S.D.N.Y.1982) (Leval, J.).

## II. *Parole Board Defendants*

■ The parole board defendants (Dean, Buchanan, and McNiff) have attacked the claims against them on the grounds that they are entitled to absolute immunity as members of a Parole Board hearing panel. The issue of whether New York State Parole hearing examiners are entitled to absolute immunity is one which has not been addressed by the Second Circuit, and the defendants have pointed to *dicta* in *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), and decisions in other circuits. *See e.g., Walker v. Prisoner Review Board*, 769 F.2d 396, 397–98 (7th Cir.1985), *cert. denied*, 474 U.S. 1065, 106 S.Ct. 817, 88 L.Ed.2d 791 (1986); *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981).

According to Jones, however, parole board members should enjoy only qualified immunity for these acts here, in the same way and for much the same reason that prosecutors do. In our criminal justice system prosecutors perform both quasi-judicial actions such as bringing charges and quasi-administrative or investigative functions. Immunity law "has recognized the functionally diverse tasks which fall to prosecutors by creating two distinct types of im-

munity: when a prosecutor performs 'quasi-judicial' acts he enjoys *absolute* immunity, but when he performs 'investigative' or 'administrative' acts he enjoys only *qualified* immunity." *McDonald v. Doe*, 650 F.Supp. 858, 860 (S.D.N.Y.1986) (emphasis in original); *see also Powers v. Coe*, 728 F.2d 97, 104 (2d Cir.1984).

Here, the torts that Jones has laid at the feet of the parole defendants fall into their quasi-adjudicative roles. Specifically, Jones alleges that in applying parole guidelines in Jones' specific case, the parole board defendants imposed a guidelines range greater than they should have, ignored Jones' good institutional educational and training record, and stated that Jones should "continue in alcohol therapy before release to society" when Jones had never had an alcohol problem and had never been in alcohol therapy. Such actions are the epitome of the parole board's quasi-adjudicational function: making a parole decision in an individual case. Consequently, for the torts complained of, the parole defendants would enjoy absolute immunity even under a function-specific immunity test similar to the test for prosecutors. The claims against defendants Dean, Buchanan, and McNiff are, therefore, dismissed.

*Statement of Claim Against DOCS Defendants*

According to defendants, Jones' complaint fails to contain specific enough factual requirements to show a deprivation of civil rights. While a plaintiff bringing a civil rights claim does have to include specific allegations of fact, *Koch v. Yunich*, 533 F.2d 80, 85 (2d Cir.1976), Jones has done so.

To dismiss a claim for failure to state a claim upon which relief can be granted, a court must accept plaintiff's allegations at face value, *Heit v. Weitzen*, 402 F.2d 909, 913 (2d Cir.1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), must construe the allegations in the complaint in plaintiff's favor, *Scheurer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and must dismiss the complaint only if "it appears beyond a doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Jones has pled that a series of actions were taken against him in order to retaliate against or discourage him from pursuing his rights in court. Some of these acts would be tortious standing alone, and, linked by the theme of retaliation, others can become tortious even if they would not have been, absent an invidious purpose. "[I]t is well settled that acts which are in themselves legal lose that character when they become consistent elements of an unlawful scheme." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962); *see also Lawrence v. Acree*, 665 F.2d 1319, 1323–24 (D.C.Cir.1981) (per curiam).

*Immunity Under State Law*

With respect to Jones' pendent claims, defendants have claimed immunity under N.Y.Correct.Law § 24 (1987 McKinney's), which provides:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

The question, of course, is whether the deliberate, systematic, and grossly unlawful violations of civil rights alleged (which must all be taken as true) fall "within the scope of the employment and in the discharge of the duties" of the officers. It cannot be seriously maintained that New York meant to immunize a corrections officer in civil actions anytime he dons his

uniform before committing serious crimes. Conduct such as this—deeply repugnant to both New York and the federal government's most fundamental policies—is well outside the scope of employment and the discharge of duty.

The defendants have cited no legislative history and no cases to the contrary. Indeed, the only case they cite on § 24 is *Lumpkin v. Albany Truck Rental Service,* 70 A.D.2d 441, 421 N.Y.S.2d 714 (3d Dept. 1979), in which the issue was not whether specific conduct was within the scope of employment, but rather whether a third party contributory action falls under the terms of the statute. A negligence action involving a truck's tire going flat on the highway while rented to the Department of Corrections, *Lumpkin* has no bearing on this issue.

*Conclusions*

For the foregoing reasons, the First, Second, and Fourth claims, all of which are founded on acts occurring prior to December 29, 1983, as well as those parts of the Third and Sixth claims occurring before December 29, 1983, are dismissed. The claims as to parole board member defendants Dean, Buchanan and McNiff are also dismissed. In all other respects, the motion to dismiss is denied.

IT IS SO ORDERED.